VICTORY, J.,
dissenting.
hi dissent from the majority opinion because I am not convinced that the jury committed manifest error in deciding the defendant was not at fault in this accident. The jury heard the following testimony from Shelton and Amy Leblanc, who were trailing the plaintiff on the interstate for several miles before this accident:
SHELTON LEBLANC:
Q: Did you see the blue pickup truck at any time before it struck the eighteen wheeler?
A: Yes, I got on Interstate 12 at Sherwood Forest. We were heading towards Hammond and me and that little blue truck, as I got on the interstate we were kind of going through traffic together and as 1-12 narrowed to two lanes at O’Neal he went around me and was in front of me where he stayed until the accident.
Q: Did you ever lose sight of the blue pickup truek-
A: No.
Q: From that point up until the accident?
A: No sir.
Q: How far away from the eighteen wheeler were you when you first saw it?
A: Probably a quarter to a half mile.
Q: What lane were you in at that point?
| jjA: The left.
Q: What lane was the eighteen wheeler in?
*246 A: The left.
Q: Was the eighteen wheeler moving?
A: It didn’t appear to be.
[[Image here]]
Q: How much time would you say went by from when you first saw the eighteen wheeler and when the collision occurred?
A: Probably about twenty seconds.
Q: And what was going on during those twenty seconds?
A: I was driving on interstate, I had cruise set. Whenever I saw the truck ahead was stopped I touched my brakes so the cruise would turn off and started coasting down and noticed that the truck in front of me had kept his speed because he was still, the gap between us was getting bigger. And I don’t know I guess me and Amy talked about it, you know, look he’s not stopping, he’s not stopping. He just didn’t stop.
Q: Did [ ] Mr. Brewer in the blue pickup truck apply his brakes at any time before impact?
A: He did apply his brakes. I mean it all happened, whenever his brake lights come on maybe a second or so later, he hit the truck.
Q: During the approximate twenty seconds that you observed Mr. Brewer continuing toward the rear of the tractor trailer, did you see the tractor trailer make any leftward movement?
A: No.
Amy Leblanc also testified as follows:
AMY LEBLANC:
Q: Alright, you say there were cars stacked up, where were they?
A: They were all in front of the eighteen wheeler. There was no one behind the eighteen wheeler.
Q: So was he [the Hunt driver] like a car length or two behind the vehicle in front of him?
13A: Um-hum, yes.
Q: Well from that point forward just tell us what happened from the point you first see the eighteen wheeler until the collision occurs.
A: Okay we were probably an eighth of a mile behind the blue truck. And we had our, my husband had the cruise set. When he noticed the cars up ahead stopped he disengaged cruise. We had plenty of enough time to coast down from cruise. We didn’t have to hit our brakes. But we noticed the blue truck wasn’t stopping. You could tell he was maintaining the speed. He wasn’t slowing down or anything, no brakes or anything up until maybe a second before he hit the truck he did hit the brakes.
Q: Was there any discussion between you and your husband during that period of time?
A: Yes, we probably about three times said, “He’s not going to stop, he’s not going to stop.” And then you know, “Oh my god, he’s not stopping.” And that’s when he hit him.
Apparently, the jury believed this testimony, which is not inconsistent with the accident photographs.
Based on the photographs and the Le-blancs’ testimony, the cab of the 18-wheel-er was in the left-hand lane and its trailer was almost in the left-hand lane when the accident occurred. The plaintiff was clearly driving too fast under the circumstances and simply ran into the back of the 18-wheeler that was almost completely stopped. The plaintiff steered toward the *247 right lane to avoid the truck, but was unsuccessful and then steered back into the rear of the truck as he continued to skid. While the majority points out some inconsistencies in the truck driver’s testimony, the jury heard those inconsistencies and nonetheless rendered a verdict placing all of the blame for this accident on the plaintiff, apparently accepting the substance of the Leblancs’ testimony. Therefore, it was not manifestly erroneous for the jury to place no fault for this accident on the truck driver. This very day, our court has correctly stated the law on manifest error:
We understand and appreciate the reality that many times we would |4have judged the case differently had we been the trier of fact, but this is not our function as a reviewing court. A reviewing court cannot disturb an award because it would have judged the case differently. The manifest error doctrine is not so easily broached. Rarely do we find a reasonable basis does not exist in cases with opposing views. We note it is not hard to find a reasonable basis for a finding, which makes the manifest error doctrine so very difficult to breach, and this is precisely the function of the manifest error review. A reviewing court has only the “cold record” for its consideration while the trier of fact has the “warm blood” of all the litigants before it. This is why the trier of fact’s findings are accorded the great deference inherently embodied in the manifest error doctrine. So once again we say it should be a rare day finding a manifest error breach when two opposing views are presented to the trier of fact. Shannon Menard et al. v. Lafayette Insurance Company et al., 09-1869, p. 21-22, 31 So.3d 996 (La.3/16/10) (emphasis original).
For the above reasons, I respectfully dissent.