KNOLL, Justice.*
11 This writ concerns whether the Court of Appeal correctly applied the manifest error standard of review in increasing the jury’s award for future medical expenses in this personal injury case. Plaintiff, Shannon Menard (Menard), filed the instant suit against defendants, Lafayette Insurance Company (Lafayette Ins.), Pre-jean Service Company, Inc. (Prejean), and Scott Benjamin Buxton (Buxton), for damages she sustained as a result of an automobile accident.[1] The jury rendered judgment in plaintiffs favor awarding her $88,373.73 for future medical expenses. Finding manifest error in the jury’s award for future medical expenses, the appellate court increased the award to $1,413,508.75. *1000 We granted certiorari to address the correctness vel non of the appellate court’s review of the jury’s award for future medical expenses. Shannon Menard v. Lafayette Ins. Co., 09-1869 (La.11/20/09), 25 So.3d 804. Finding the Court of Appeal erred in its application of the manifest [2error standard of review in amending the jury’s award, we reverse the Court of Appeal’s judgment and reinstate the jury’s verdict.
FACTS AND PROCEDURAL HISTORY
On May 8, 2001, at approximately 5:40 p.m., Ms. Menard’s 1993 Honda Accord was stopped at a red light on Louisiana Highway 3095 in Lafayette, Louisiana. At about this time, a 1995 Chevrolet Model 6000 two-door pick-up truck driven by Buxton, who was in the course and scope of his employment with Prejean, rear-ended a 1998 Volvo S70, which vehicle in turn rear-ended Ms. Menard’s vehicle. Immediately following the accident, Ms. Menard was taken by ambulance to the emergency room at the Medical Center of Southwest Louisiana. Ms. Menard subsequently sought treatment from Dr. Michael R. Ca-vanaugh, Dr. Thomas J. Montgomery, Dr. James N. Domingue, Dr. James A. Pearce, and Dr. Scott A. Gammel for head, jaw, neck, back, shoulder, and knee complaints. Ms. Menard was thirty-three years of age at the time of the accident.
Ms. Menard filed suit against Buxton, Prejean, and their insurer, Lafayette Ins., for damages she sustained as a result of the accident.[2] In her petition, Ms. Menard alleged, in pertinent part:
As a result of this accident, Plaintiff ... was caused to sustain severe and painful personal injuries to bones, muscles, ligaments, tendons, nerves, blood vessels and other structure of her head, neck, back, right knee, arms and other parts of her body, including, but not limited to, cervical and lumbar strain and sprain; injuries to her face; injuries to the nervous system and psyche and other systems of the body, resulting in extreme anxiety, pain and suffering; and the aggravation and exacerbation of prior existing, non-disabling predispositions, including normal degenerative changes.
[[Image here]]
[sShe has incurred medical, hospital, and related expenses; and may require hospital, medical and related care, including surgery in the future. These conditions will continue and may worsen.
Before trial, defendants stipulated to liability and insurance coverage. The matter proceeded to jury trial on June 23, 2008,[3] solely on the issue of damages. Only the award for future medical expenses is strongly disputed before us. In her casein-chief, Ms. Menard presented the testimony of two of her treating physicians, Dr. *1001 Pearce and Dr. Gammel, as well as the testimony of an economist, Dr. Doug Womack. By joint stipulation of the parties, she also introduced her medical records. We have carefully examined all of her record medical evidence as detailed below, and find no internal inconsistencies as the Court of Appeal did. Rather, we find two opposing views were presented to the jury by plaintiff and defendants respectfully, and the jury deduced its award for future medicals on a reasonable basis.

Testimony of Dr. James A. Pearce

Dr. James A. Pearce, a dentist, who specializes in patients with temporoman-dibular joint disorders (TMJ) and orificial pain, testified via video disposition he began treating Ms. Menard on October 31, 2001, for TMJ and last saw her professionally on December 3, 2007, approximately seven months before the beginning of trial. He testified her TMJ condition was caused more probably than not by the accident sued upon, but bruxism or grinding of the teeth is a well-known cause of TMJ. His records noted excessive attrition or wearing of her teeth, which could have probably caused a bruxism condition years before the accident. He further testified she will more probably than not be required to wear a splint for the indefinite future, which splint will have to be replaced, retooled, or resurfaced every five to six Uyears. He estimated the following costs of care: $750 for splints every 5 to 6 years, $100 for retooling, $75 to $100 for yearly doctor visits, and $75 for a Panorex “maybe” every 5 years. According to his testimony, plaintiffs treatment would require no muscle relaxers or physical therapy, and at the time of trial, she was at maximum medical improvement, stable, and asymptomatic.

Testimony of Dr. Scott A. Gammel

Dr. Scott Gammel, an anesthesiologist with a specialty in the treatment of chronic pain and board certified in anesthesiology and pain management, testified he had been treating Ms. Menard upon referral from her attorney since February 13, 2003, for cervical and lumbar spine injuries. He opined as a result of the accident Ms. Menard suffered spinal column injuries to multiple levels of the motion sections of her back and neck. During his treatment, Ms. Menard received eight epidural spinal injections, one radiofrequency neural ablation,[4] and three cervical facet injections. Although he recited the potential side effects of steroid injections at the injection site, such as, pain, infection of soft tissue, and loss of skin color, he noted Ms. Me-nard has shown no signs of these symptoms. He testified Ms. Menard will need treatment for the rest of her life to control her pain, which treatment he estimated or anticipated will include at a minimum four doctor visits, two six-week sessions of physical therapy, four epidural spinal injections, and one radiofrequency neural ablation per year; an MRI more than every two years depending on symptomatology; and a lifetime of medications, including Lortab, Percocet, Lexapro, Lidoderm patches, and Voltaren gel. Although he believed future surgery was a possibility, Dr. Gammel could not say it was more probable than not.
| ¡^Regarding objective signs of Ms. Me-nard’s cervical lumbar spine injuries, Dr. Gammel referenced Ms. Menard’s x-rays taken in the hospital on May 8, 2001, immediately following the accident, the report of which indicated “mild reversal of the cervical curvature compatible with spasms.” He also noted Ms. Menard’s MRIs showed mild narrowing of the right *1002 C6-7 neural foramen[5] (August 24, 2002), mild bulging at C4-5 (August 26, 2002) and then at C4-5 and C5-6 (June 15, 2004), and minimal convexity[6] at L5, SI (June 17, 2003), which later progressed into a small, midline protrusion at that same level (January 25, 2006). Dr. Gammel interpreted this change at the L5, SI level as demonstrating “the disk was originally injured at the time of her accident and over time it progressed to the point where it became protruded.” Dr. Gammel also testified the report of Ms. Menard’s June 15, 2004 MRI, which indicated mild bulging at the C4-5 and C5-6 levels, actually said “the MRI of the C spine was essentially negative.” Additionally, Dr. Gammel discussed the fluoroscopic images taken by him after injection of contrast into Ms. Menard’s facet joints that revealed facet joint capsular disruption at two levels.
On cross-examination, Dr. Gammel admitted normal findings could be interpreted from a layman’s standpoint as a negative finding, there was no evidence of nerve root impingement, disk bulges are not surprising in a woman of Ms. Menard’s age, and “over time we all will have degenerative disk disease.” He also explained his records noted Ms. Menard was on no medication when she began her treatment with him, Ms. Menard actually waited six months between visits after a steroid injection and was instructed to return as needed, and by her December 9, 2005 | (¡visit, Ms. Menard’s neck symptoms had improved to such a point he was not going to do another radiofrequency neural ablation. The focus of treatment then turned to the lumbar spine.

Testimony of Dr. Doug Womack

Dr. Doug Womack, an economist and a retired professor of economics at the University of Louisiana, testified concerning the present-day value of Ms. Menard’s future medical needs. He reached his conclusions by assuming a life expectancy of 41.44 years, accepting the testimony of Dr. Gammel concerning the need for and cost of future care, and assuming Ms. Menard would require no surgery in the future. Dr. Womack testified his initial calculations admitted into the record as Menard’s Exhibit 8 were based on a phone conversation with Dr. Gammel and provided the following medical expenses based on the category of treatment:
Doctor visits (Dr. Gammel). $ 22,884
(90 x 4/yr=360/yr)
Physical Therapy. $ 228,843
(150 X 24/yr = 3,600/yr)
Lorlab/Percocet. $ 34,612
(P 45/mo L 68/mo = $678/yr ave)
Mobic/EC Naproxen-muscle relaxers... $ 47,171
(M 80/mo N 74/mo = 924/yr ave)
Lexapro. $ 63,711
(104/mo = $1,248 yr)
Lyrica. $ 100,468
(164/mo = $l,968/yr)
Lidoderm Patch. $ 43,699
(214/mo 4 mo/yr = 856/yr)
Volleran Gel [sic] . $ 41,657
(34/tube 2/mo = 816/yr)
Epidural Steroid Injections (3/yr):
Office Visits . $ 11,442
(60 ea = 180/yr)
Doctor’s Fee. $ 152,562
(800 (lumbar) = 2,400/yr)
Facility Fees. $ 393,801
(2,065 ea = 6,195/yr)
Fluoroscopy. $ 28,605
(150 ea = 450/yr)
Sedation . $ 41,955
17(220 ea = 660/yr)
Radiofrequency Neural Ablation (2/4yr):
(Lumbar)
Office Visits . $ 1,907
(30/yr (60/vis))
Doctor’s Fee. $ 20,024
(315/yr (630/vis))
Facility Fees. $ 65,634
(1,032.50/yr (2065/vis))
Fluoroscopy. $ 4,768
(75/yr (150 ea))
*1003 Sedation . $ 6,992
(110/yr (220 ea))
MRI. $ 38,141
(1800/3yrs = 600/yr)
DMX (Digital Motion X-ray). TBD
(l/3yrs TBD)
X-Rays . $ 1,907
(80-100 ea l/3yr = 30/yr)
Referrals to Specialists (l/6yrs):
Psychologist/Psychiatrist. $ 3,178
(300/6 yrs = 50/yr)
Spine Surgeon. $ 3,178
(300/6yrs = 50/yr)
TMJ Specialist Visits (Dr. Pearce). $ 8,454
(100/9 mos = 133/yr)
Mouth Splint . $ 9,535
(750/5yrs = 150/yr)
TOTAL. $1,375,128
As can be seen, in his initial calculations Dr. Womack included an x-ray every three years at a present day value of $1,907, and referrals to a spine surgeon and a psychologist/psychiatrist every six years at a present day value of $3,178 each.
During trial, Dr. Womack revised and/or increased his calculations based on Dr. Grammel’s trial testimony. Specifically, Dr. Gammel testified, although Ms. Me-nard might need x-rays, “typically that MRI suffices,” and his only testimony concerning visits to a surgeon or a psychologist was such referrals “will probably be required sometime in the future,” with no specificity as to how often they might be required. Dr. Gammel also increased the frequency of an MRI from one every three years to one every two years, increasing the cost by fifty percent, the number of |sepidural steroid injections from three to four per year, increasing the cost by twenty-five percent, and the number of radiof-requency neural ablations from two every four years to one every year, doubling the cost. The following is a compilation of Dr. Womack’s updated calculations of future medical expenses based on the category of treatment:
Office visits to Dr. Gammel. $ 22,884
Physical therapy . $228,843
Pain Medication and muscle relaxers.. $331,318
Epidural Steroid Injections. $785,456.25
Radiofrequency Neural Ablations .... $198,650
MRI. $ 57,211.50
Office Visits with Dr. Pearce. $ 8,454
Mouth splints. $ 9,535
Total. $1,642,351.75
Significantly, Dr. Womack did admit on cross-examination the cost of medicals he relied upon would be impacted by testimony of other physicians such treatment was not necessary or by plaintiffs own testimony she did not go to physical therapy or she did not take such medications. He explained: “If she doesn’t need all these medical services that I have included here, the total dollar amount might be less. On the other hand, there is also the possibility that I should point out, that she might need more.”

Testimony of Dr. David W. Aiken, Jr.

In their case-in-chief, defendants called their medical expert, Dr. David W. Aiken, Jr., an orthopedic surgeon tendered as an expert in the field of orthopedic surgery and treatment of spinal diseases, who reviewed Ms. Menard’s medical records from her various treating physicians, particularly Dr. Domingue, Dr. Pearce, Dr. Montgomery, Dr. Cavanaugh, and Dr. Gammel, as well as reports from several objective tests performed on Ms. Menard, including an electromyogram/nerve conduction study (EMG/NCS), a lumbar MRI scan, a left shoulder MRI scan, a right |9knee MRI scan, and two cervical MRI scans. Notably, Dr. Aiken never physically examined Ms. Menard.[7] He reviewed Ms. Menard’s medical records from her various treating physicians and testified regarding his impressions of their treatments and findings concerning her medical condition.
According to Dr. Aiken, Dr. Cavanaugh, a chiropractor, treated Ms. Menard for *1004 initial complaints of neck pain, thoracic pain, right knee pain, and left arm pain from May 2001 to January 2002. Dr. Ca-vanaugh then referred Ms. Menard to Dr. Montgomery, an orthopedic surgeon, who first saw Ms. Menard on September 5, 2001, and noted complaints of left shoulder, right knee, and neck pain. His records indicated on her first visit he felt Ms. Menard had “Cervical Strain,” “Left shoulder contusion,” and “Right knee contusion.” Those same records noted “overall, [he] didn’t see any serious abnormalities.” No complaints of low back pain were noted in Dr. Montgomery’s records, and Dr. Aiken’s review revealed August 30, 2002, was the last date Dr. Montgomery mentioned any of the complaints from the accident.[8] Dr. Montgomery then referred Ms. Me-nard to Dr. Domingue, a neurologist, who saw Ms. Menard one time on August 22, 2002, and conducted an EMG/NCS of her back and right lower extremity. According to Dr. Aiken, Dr. Domingue imported the study as “normal.”
Dr. Aiken also testified the radiologist reported Ms. Menard’s lumbar MRI performed on June 17, 2003, which indicated the slight convexity of the L5, SI level referenced by Dr. Gammel, as being “within physiologic limits.” [9] He also testified Imthe report of Ms. Menard’s cervical MRI performed on May 19, 2004, which showed mild bulging at C4-5 and C5-6 as referenced by Dr. Gammel, was also normal or within physiologic limits as one would normally expect to see bulging disks in someone of Ms. Menard’s age.
His review of Ms. Menard’s medical records yielded the following four opinions presented to the jury as Defendants’ Exhibit 2:
(1) Dr. Montgomery fully evaluated the patient on six occasions from October 3, 2001 to August 30, 2002 and never found anything wrong with the patient except for soft tissue injuries (contusions, sprains, and strains) to the neck, left shoulder and right knee.
(2) All objective tests performed on the patient including an Electromyo-gram/Nerve Conduction Study, a lumbar MRI scan, a left shoulder MRI scan, a right knee MRI scan, and two cervical MRI scans were all normal.
(3) Soft tissue injuries improve with the passage of time, but this patient claims no improvement with the passage of five years, page 47 Ms. Menard’s second deposition. This does not seem believable without some objective abnormality appearing on MRI scanning.
(4) Excessive steroid usage can cause many bad effects in a patient including thinning of the skin, easy bruising, weight gain, puffiness of the face, elevation of blood pressure, cataract formation, glaucoma, peptic ulcers, esophagi-tis, pancreatitis, avascular necrosis of the hips, and thinning of the bones. I think Dr. Gammel’s injections have passed the number where they are safe and should be discontinued. [He noted Ms. Menard had had 18 steroid injections.]
He offered no opinion concerning past or future medical expenses.

*1005
Jury Verdict

On July 25, 2008, the jury rendered the following verdict for plaintiff:
1. The negligence of defendant was the cause-in-faet of injuries and damages sustained by plaintiff, Shannon Menard;
2. Plaintiff, Shannon Menard, is awarded the following amount of damages to adequately compensate her injuries and damages:
a. Physical injury suffered . $ 21,000.00
b. Pain and Suffering, bolh physical and mental. $ 50,000.00
c. Permanent, disability and/or impairment, if any. $ —0—
d. Loss of earnings and/or earning capacity, if any, | nboth past and future. $ 20,500.00
e. Medical expenses, both past and future $185,300.00
f. Loss of enjoyment of life. $ 3,200.00
g. Loss of household services. $ —0—
A review of the jury’s award demonstrates the past medical expenses consist of $96,926.27 and future medicals of $88,373.73. After the jury’s verdict was reduced to judgment,[10] the plaintiff appealed, seeking an increase in the award for medical expenses.

Judgment of the Court of Appeal

The Third Circuit Court of Appeal amended the district court’s judgment, increasing the award for medical expenses from $185,300 to $1,510,435.02. Shannon Menard, v. Lafayette Ins. Co., 09-0029, p. 17 (La.App. 3 Cir. 6/3/09), 13 So.3d 794, 806. In its review of the record, the appellate court found:
In evaluating the jury verdict on this issue, we find it to be internally inconsistent. It is clear that the jury rejected Dr. Aiken’s opinion that Ms. Menard’s injury was minor and should have already resolved itself, but accepted his opinion with regard to the type of future medical treatment she should receive. We reach this conclusion because the difference between the undisputed $96,926.27 in past medical expenses and the $185,300.00 jury award for both past and future medical expenses is $88,373.73. In other words, the jury concluded that Ms. Menard’s injuries were sufficiently severe to warrant future care from her treating physicians but, at the same time, tied the hands of those physicians to conduct treatment they deem appropriate.
[[Image here]]
Here, because Dr. Aiken never examined Ms. Menard and based his opinion solely on his review of her medical records, Dr. Aiken’s opinion is entitled to less weight than that of Dr. Gammel, her treating physician. See Estate of Chaisson v. Judice Dirt & Sand, Inc., 94-393 (La.App. 3 Cir. 11/2/94), 649 So.2d 502. However, even if this jury had given full weight to Dr. Aiken’s testimony that some of the future suggested treatments — the radiofrequency neural ablations and the epidural steroid shots — were not necessary, the jury’s verdict is still not consistent with the uncontradicted evidence of what the remaining required future medical treatments would cost. In light of this internally inconsistent verdict, we hold that the jury manifestly erred in failing to | )2award the full value of the medical treatment that was established at trial to be medically necessary, and amend the award to include the present-day value of those future treatments.
Ms. Menard and Dr. Gammel both testified that she had not attended the physical therapy sessions that were prescribed for her in the past, so we do not award any costs for physical therapy. We award the costs of the future office *1006 visits with Dr. Gammel, the pain medication and muscle relaxers, the epidural steroid injections, the radiofrequency neural ablations, the MRIs, the office visits with Dr. Pearce, and the mouth splints, which total $1,413,508.75. The undisputed past medical expenses total $96,926.27. Accordingly, we amend the jury award to increase the award of medical expenses, both past and future, from $185,300.00 to $1,510,435.02.
Id. at pp. 15-17,13 So.3d 805-06 (footnotes omitted).
In addressing the correctness vel non of the appellate court’s manifest error review of the jury’s award for future medical expenses, we begin with a discussion of future medical expenses and the appropriate application of the manifest error standard of appellate review vis-a-vis awards for future medicals.
LAW AND DISCUSSION
Under Louisiana law, a tort victim may recover past (from injury to trial) and future (posttrial) medical expenses caused by tortious conduct. Frank L. Ma-raist & Thomas C. Galligan, Jr., Louisiana ToH Law § 7.02[1], 7-5(Michie 2009). The victim must, however, establish he incurred past medical expenses in good faith as a result of his injury and future medical expenses will more probably than not be incurred. Stiles v. K Mart Corp., 597 So.2d 1012, 1012 (La.1992)(remanding for a determination of “an award for future medical expenses which the medical evidence established that plaintiff, more probably than not, will be required to incur”); Maraist & Galligan, supra, § 7.02[1], 7-5-7-6. A plaintiff shows the probability of future medical expenses with supporting medical testimony and estimations of their probable cost. Smith v. Municipality of Ferriday, 05-755, pp. 11-12 (La.App. 3 Cir. 2/1/06), 922 So.2d 1222, 1231, unit denied, 06-0934 (La.9/29/06), 937 So.2d 860; Highlands Ins. Co. v. Missouri Pacific R. Co., 532 So.2d 317, 324 (La.App. 3d Cir.1988), judgment affirmed sub nom,. Lee v. Missouri Pacific R. Co., 540 So.2d 287 (La.1989); see also, Stiles, 597 So.2d at 1012 (referring to future medical expenses established by medical evidence). Importantly, future medical expenses must be established with some degree of certainty. Highlands, 532 So.2d at 324. Nevertheless,
[w]hen the record establishes that future medical expenses will be necessary and inevitable, the court should not reject an award of future medical expenses on the basis that the record does not provide the exact value of the necessary expenses, if the court can examine the record and determine from evidence of past medical expenses and other evidence a minimum amount that reasonable minds could not disagree will be required.
Stiles, 597 So.2d at 1012. The proper standard for determining whether a plaintiff is entitled to future medical expenses is proof by a preponderance of the evidence the future medical expense will be medically necessary. Hoskin v. Plaquemines Parish Gov’t, 97-0061 (La.App. 4 Cir. 12/1/97), 703 So.2d 207, 211, writ denied, 98-270, 98-271 (4/3/98), 717 So.2d 1129.
Notably, it is well acknowledged an award for future medical expenses is in great measure highly speculative and not susceptible to calculation with mathematical certainty. Highlands, 532 So.2d at 324. It follows, therefore, such awards “generally do not involve determining the amounts, but turn on questions of credibility and inferences, i.e., whose experts and other witnesses does the jury believe?” Maraist & Galligan, supra, § 7.02, 7-4.
In accordance with well-established law, much discretion is left to the *1007 judge or jury in its assessment of quantum, both general and special damages. La. Civ.Code. art. 2324.1 (“In the assessment of damages in cases of offenses, quasi offenses ... much discretion must be left to the judge or jury.”); Guillory, 09-0075 at p. 14, 16 So.3d at 1116. As a determination of fact, a judge’s or jury’s assessment of quantum, or the appropriate amount of damages, is one entitled to great deference on review. Guillory, 09-0075 at p. 14, 16 So.3d at 1116; Wainwriglit, 00-0492 at p. 6, 774 So.2d at 74.
[T]he reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court’s better capacity to evaluate live witnesses (as compared with the appellate court’s access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.
Guillory, 09-0075 at p. 14, 16 So.3d at 1116-17 (quoting Perkins v. Entergy Corp., 00-1372 (La.3/23/01), 782 So.2d 606). “Because the discretion vested in the trier of fact is so great, and even vast, an appellate court should rarely disturb an award on review.” Guillory, 09-0075 at p. 14, 16 So.3d at 1117 (emphasis added).
An appellate court, in reviewing a jury’s factual conclusions with regard to special damages, must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court’s conclusion, and the finding must be clearly wrong. Kaiser, 06-2092 at pp. 11-12, 953 So.2d 810; Guillory v. Insurance Co. of North America, 96-1084, p. 5 (La.4/8/97), 692 So.2d 1029, 1032. This test requires a reviewing court to do more than simply review the record for some evidence, which supports or controverts the trial court’s findings. The court must review the entire record to determine whether the trial court’s finding was clearly wrong or manifestly erroneous. Guillory, 09-0075 at p. 16, 16 So.3d at 1118; Kaiser, 06-2092 at p. 12, 953 So.2d at 810. The issue to be resolved on review is not whether the jury was right or wrong, but whether the jury’s fact finding 115conclusion was a reasonable one. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989); Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973).[11]
Notably, reasonable persons frequently disagree regarding the measure of damages in a particular case. Guillory, 09-0075 at pp. 15-16, 16 So.3d at 1117. Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Rosell, 549 So.2d at 844. “Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.” Canter, 283 So.2d at 724. An appellate court on review must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently. Rosell, 549 So.2d at 844. Simply stated,
*1008 [w]hen findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact’s findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’s story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a fact-finder’s finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.
Id. at 844-45 (citations omitted).
With these principles in mind, we must review the evidence of record and determine if the jury’s award for future medical expenses was contrary to the 11Bevidence or constitutes an abuse of discretion in order to answer the question presently before us of whether “our intermediate brethren erred in failing to apply in the instant case th[ese] principiéis] of appellate review of facts.” Canter, 283 So.2d at 724.

Manifest Error Review

The record reveals the jury was presented with two competing views founded on expert medical testimony regarding the extent of plaintiffs future medical treatment. On the one hand, Ms. Menard relied upon the testimony of her treating physicians, Dr. Gammel and Dr. Pearce, in support of her position the accident caused her to suffer significant injury requiring medical treatment for the rest of her life.
On the other hand, defendants relied upon the testimony of their expert, Dr. Aiken, to demonstrate Ms. Menard’s complaints were not as severe. Dr. Aiken based his testimony on his review of Ms. Menard’s medical records and his evaluation of Dr. Gammel’s diagnosis regarding her perpetual need for medical treatment in the form of epidural steroid injections, radiofrequency neural ablations, and medications.
As evident by its verdict, the jury made a factual finding Ms. Menard was not permanently injured or impaired from the accident, and consequently, the jury awarded Ms. Menard some of the future medical expenses sought because it obviously felt her injures would resolve themselves over time. This was the position urged by the defense and heard by the jury. The jury accepted the positions advanced by both parties and awarded damages consistent with an injury not as severe as plaintiff alleged, but not as minimal as defendants alleged. In other words, the jury found, while Ms. Menard’s injuries were still problematic at the time of trial and would continue to be so for a period of time, they would resolve in time and would not necessitate the frequency or duration of treatment and the costs predicted by Dr. |17Gammel and Dr. Womack. Based on our study of the record evidence as to each category of treatment and its correlating cost, we find this conclusion is reasonable and is not as the Court of Appeal found internally inconsistent.
Given the sum awarded, we can infer the jury did not find Ms. Menard proved the need for continued treatment with steroid injections. Both medical and lay testimony supports this finding. First, the jury heard from both Dr. Gammel and Dr. Aiken regarding the potential debili *1009 tating side effects of continued steroid use. Second, the jury heard from Ms. Menard’s daughter, Baili, concerning the aftereffects of the injections. She testified after an injection, her mother “can’t walk at all. And she can’t drive. She stays on the couch for about two days.” Baili also testified after those doctor’s appointments, she had to help her mother walk and take a bath because she was hurting. Third, the records of Ms. Menard’s previous treating physicians, Drs. Montgomery and Do-mingue, noted no objective need for such treatment, did not indicate any referral of Ms. Menard for such treatment, and had diagnosed Ms. Menard with soft tissue injuries with no objectively evident signs of nerve damage. Additionally, Ms. Me-nard’s testimony was consistent with Dr. Aiken’s testimony regarding her treatment with Drs. Montgomery and Domingue and their interpretation of the various tests. She testified her then treating physician, Dr. Montgomery, reported to her that her MRIs were normal and indicated she had a soft tissue injury, a diagnosis he maintained throughout her treatment. As an additional confirmation, he referred Ms. Menard to Dr. Domingue, who performed a “nerve test” to find out if she had any objectively identifiable nerve damage. According to plaintiff, the test was normal, indicating no nerve damage. Fourth, according to Dr. Aiken’s testimony, Ms. Me-nard’s soft tissue injuries as diagnosed by Dr. Montgomery should have, but most definitely would be, resolved over time and would and should not have | ^necessitated treatment by steroid injections. Finally, regarding the frequency of such treatments, the jury heard testimony from Dr. Gammel regarding his notes and records that plaintiff went as long as six months without a return visit after an injection. An inconsistency in his testimony regarding the frequency of treatment was revealed during Dr. Womack’s testimony. Dr. Womack explained that in his phone conversation with plaintiffs physician, Dr. Gammel opined plaintiff would require three injections per year, but then increased that number to four in his trial testimony. From this the jury could have reasonably concluded Ms. Menard did not establish by a preponderance of the evidence the need for steroid injections on as frequent a basis as Dr. Gammel predicted or such treatments and the expenses thereof would be medically necessary given the resolvable nature of her injuries.
Likewise, the jury clearly did not find Ms. Menard established treatment with radiofrequeney neural ablations as anticipated by Dr. Gammel was medically necessary or inevitable. This finding is also supported by the record evidence. As to his utilization of radiofrequeney neural ablations, Dr. Aiken testified in the negative stating it “is a harmful treatment.” Regarding the frequency of such treatments, the jury again heard from Dr. Gammel regarding his notes and records, which indicated plaintiffs neck had so improved radiofrequeney neural ablations would be discontinued and, during the five years of treatment with Dr. Gammel, plaintiff only underwent one such ablation. Dr. Womack’s testimony also revealed an inconsistency in Dr. Gammel’s testimony regarding the frequency with which Ms. Menard would need such treatments. According to Dr. Womack, Dr. Gammel originally stated plaintiff would require two ablations every four years, but at trial, he testified plaintiff would require one ablation a year. Moreover, as with the steroid injections, neither Dr. Montgomery’s records of his treatment of Ms. Menard’s soft 119tissue injuries nor Dr. Domingue’s records noted any objective need for such treatment or indicated a referral of Ms. Menard for such treatment. In light of this evidence, the jury could have reason *1010 ably concluded Ms. Menard’s condition could and did in one respect improve to the point radiofrequency neural ablations would and could be discontinued, and Ms. Menard did not establish the probability such treatment and the associated expenses would be medically necessary on as frequent or long-term a basis as Dr. Gam-mel testified it would be.
As to the frequency and need for MRIs, Dr. Gammel actually testified he could not predict the frequency, but plaintiff would definitely need to have followup MRIs, depending on her symptomatology. Inconsistencies as to his opinion regarding the frequency of such imaging were again evident in Dr. Womack’s testimony, which revealed Dr. Gammel initially estimated one MRI every three years, but then increased that estimate to one every two years. Given its finding plaintiffs injuries would eventually resolve symptomatically and were not of a permanent nature, the jury could have reasonably concluded Ms. Menard did not prove an MRI more than every two years and the cost thereof would more probably than not be medically necessary for the duration of her expected life.
Regarding the need for medication, the jury heard from Ms. Menard, in response to a question about what kinds of medications she was actually taking, that she took Lortab and Percocet at night, once or twice a week, and if the injections were effective, she could go as long as two and half months without pain medication. Significantly, in response to the question, she did not mention the use of Mobic, EC Naproxen, Lexapro, Lyrica, Lidoderm patches, or Voltaren gel. On cross-examination, it was further revealed in her deposition plaintiff testified she only took pain medication on the weekends. Moreover, Ms. Menard’s reluctance to take such 12nmedication due to the side effects, particularly drowsiness during the day while working, was quite evident in her testimony. Dr. Gammel also admitted plaintiff was not on medication when she began treatment with him. We find the jury could have reasonably concluded plaintiff did not establish more probable than not or within a reasonable degree of certainty the enumerated expenses for all the various medications referenced by Dr. Wom-ack were medically necessary and inevitable or would be incurred.
Similarly, as the Court of Appeal noted, Ms. Menard and Dr. Gammel both testified she discontinued physical therapy. Dr. Aiken’s record review also noted Ms. Menard had “no response” to the aquatic physical therapy prescribed by Dr. Gam-mel. Given her disinclination to attend physical therapy and noted lack of response, the jury could have reasonably concluded plaintiff did not prove within a reasonable degree of certainty such medical treatment and the expense thereof would necessarily be incurred.
Finally, the evidence of record demonstrates an inconsistency in the figures estimated by Dr. Womack and Dr. Pearce regarding the cost and frequency of Ms. Menard’s visits to Dr. Pearce for her TMJ treatment. Dr. Womack’s table indicates a cost of $133 per year for such visits calculated at a cost of $100 every nine months. However, Dr. Pearce testified such visits were to be on a yearly basis at a cost of $75 to $100 dollars, not $133 every year and not every nine months. We find the jury could have reasonably concluded Ms. Menard did not prove the medical expenses for her TMJ treatments estimated by Dr. Womack, who admittedly relied upon information conveyed to him by Dr. Gammel, would more probably than not be incurred. Additionally, in light of its finding Ms. Menard’s *1011 injuries were not of a permanent nature and, therefore, of a limited duration, the jury could have reasonably |2iConcluded Ms. Menard did not establish by a preponderance of evidence the medical necessity of a minimum of four office visits to Dr. Gammel every year for the duration of her life.
Consequently, we do not find it was manifestly erroneous for the jury to have concluded Ms. Menard would need some future medical care and was entitled to the expenses for such, but she did not require the amount suggested by Dr. Womack, whose calculations were based upon Dr. Gammel’s testimony, which the jury clearly did not adopt in its entirety. We have carefully reviewed the medical evidence in gross detail, which clearly reveals a reasonable basis for the jury’s finding. While we fully understand plaintiffs position and may even be sympathetic for her need, if we find a reasonable basis exists for the jury’s award, in our function as a reviewing court we must uphold this verdict. Contrary to the holding of the Court of Appeal, the jury did not “tie” the hands of Ms. Menard’s physicians, but rather limited her recovery to those expenses it deemed established within a reasonable degree of certainty were medically necessary and would more probably than not be incurred.
We find the record evidence easily supports a reasonable basis for the jury’s award for future medical expenses. This jury award should not have been amended although the Court of Appeal found a higher award would have been more reasonable. We understand and appreciate the reality that many times we would have judged the case differently had we been the trier of fact, but this is not our function as a reviewing court. A reviewing court cannot disturb an award because it would have judged the case differently. The manifest error doctrine is not so easily broached. Rarely do we find a reasonable basis does not exist in cases with opposing views. We note it is not hard to prove a reasonable basis for a finding, which makes the manifest error doctrine so very difficult to breach, and this is precisely the ^function of the manifest error review. A reviewing court only has the “cold record” for its consideration while the trier of fact has the “warm blood” of all the litigants before it. This is why the trier of fact’s findings are accorded the great deference inherently embodied in the manifest error doctrine. So once again we say it should be a rare day finding a manifest error breach when two opposing views are presented to the trier of fact.
CONCLUSION
In conclusion, our review of the record in its entirety demonstrates the jury was not manifestly erroneous in its award for future medical expenses. The record evidence, including both medical and lay testimony, provides a reasonable factual basis for the jury’s conclusions, and therefore, the jury’s factual findings on the issue of future medicals are not clearly wrong. In light of these findings, we conclude the Court of Appeal erred in its review of the jury’s award for future medicals. We reverse its judgment and reinstate the jury’s verdict.
DECREE
For the foregoing reasons, the judgment of the Court of Appeal is reversed and the district court’s judgment entered in conformity with the jury’s verdict is reinstated and rendered.
REVERSED; DISTRICT COURT JUDGMENT REINSTATED AND RENDERED.
WEIMER, J., concurs and assigns reasons.

 Kimball, C.J., participated in oral argument but did not participate in the deliberation of this opinion.

. Ms. Menard also filed suit on behalf of her minor daughter, Baili Elizabeth Racca, to recover Baili's damages for loss of consortium with her mother as a result of the accident. The jury found Baili was entitled to consortium damages and awarded Baili $20,000 as necessary and adequate compensation. Bai-li’s claim and her award were not at issue on appeal or in the defendants’ application to this Court, and therefore, neither Baili's claim nor her award will be discussed herein.

. Ms. Menard’s automobile insurer, State Farm Mutual Automobile Insurance Company (State Farm), filed a petition of intervention, asserting it had paid $5,000 in medical expenses on behalf of Ms. Menard as a result of the accident and seeking to recover that amount from defendants. The parties stipulated that State Farm was subrogated to Ms. Menard's rights against defendants for the $5,000 it paid on her behalf.

. This mailer originally came for jury trial on June 23, 2008, but after selecting and swearing a twelve-person jury panel, the district court continued the matter to July 22, 2008, because of an illness to defense counsel. On July 22, 2008, two new jury members were selected to replace two prior excused jurors released from hardship in having to serve on the rescheduled trial dale. On the very next day, July 23, 2008, the evidentiary phase of trial began.

. Dr. Gammel described this procedure as a "high tech way" of basically "microwaving" the nerve by applying heat to the nerve through a radiofrequency probe.

. Dr. Gammel explained the neural foramen is "[wjhere the nerves come out of the spinal cord.” When disks are injured, nerves are pushed back into the opening or foramen, and arthritis of the joint can occur. This could also narrow the opening, which could potentially lead to irritation of the nerve root.

. Dr. Gammel explained minimal convexity means little change in the shape of the disk.

. Dr. Aiken testified he had been “told that two appointments were made for her to see [him] but that [plaintiffs counsel] cancelled both of them.”

. On July 2, 2003, Ms. Menard returned to see Dr. Montgomery for a complaint of right wrist pain from "DeQuervain’s Syndrome,” a condition unrelated to the accident at issue. He injected her wrist three times and then took her to surgery on November 18, 2004. On her last visit of record on January 10, 2005, she was, according to his records, "doing great and having no complaints.”

. Dr. Aiken explained "within physiologic limits” means what one would expect to see in someone of that age.

. At this time, defendants deposited $427,955.56 into the registry of the court. Thereafter, with the district court’s permission State Farm withdrew $6,828.45.

. This decision was superceded on other grounds by an amendment to La.Rev.Stat. § 23:1032 as recognized in "Walls v. American Optical Corp., 98-0455, p. 3 (La.9/8/99), 740 So.2d 1262, 1265.