KNOLL, Justice,
dissenting in part and concurring in part.
hln this case riddled with inconsistencies and conflicts in both the expert testimony and the documentary evidence, including admittedly substandard charting by the nursing staff, the credibility determinations necessary to resolve the factual issues of both negligence and causation fell within the sound discretion of the jury. Under the manifest error doctrine, their findings in such circumstances “can virtually never be manifestly erroneous.” Rosell v. ESCO, 549 So.2d 840, 845 (La.1989). However, in clear breach of this well-established standard, the majority opinion concludes the jury erred in finding the hospital’s negligence in failing to promptly convey the positive amniotic fluid test results to the ordering physician, Dr. Ziegler, caused Garrett’s injuries. Based on my review of the record evidence in its entirety, I respectfully dissent from the majority’s finding in this regard and its corresponding reallocation of fault, but concur in its affirmation of the jury’s findings on all remaining issues of negligence and causation for the following reasons.
As the majority opinion concedes, the overwhelming expert testimony demonstrates the hospital’s failure to follow Dr. Ziegler’s explicit orders and report the results of the “never routine” amniotic fluid tests, i.e., that Garrett’s lungs were *119 12mature, and its failure to have in place a policy or procedure for delivering such results on the day received fell well below the applicable standard of care. The issue of whether the hospital’s negligence in this regard caused the harm suffered, however, was highly disputed, even though the defense put on no direct evidence regarding causation. Nevertheless, both Dr. Pena-Miches, Garrett’s tending pediatric neurologist, and Dr. Hardin testified, even on redirect, this negligence substantially contributed to Garrett’s injuries. Moreover, Dr. Katz testified the hospital is at fault for its nurses’ and lab’s failure to convey vitally ordered information to the ordering physician and this failure can and unfortunately did inevitably lead to injury in this tragic circumstance. Although the majority opinion essentially disregards their testimony because the evidence showed the baby was “fine” until shortly before delivery, my reading of the expert testimony and documentary evidence in its entirety does not comport with the majority’s view, but rather would support the jury’s determination.
In my view, given (1) the status of the pregnancy as high-risk and the mother as an insulin-dependent diabetic, (2) the presentation of the mother on November 1, with concerns the baby was not “moving” for several days and then with contractions on the evening of November 3, coupled with (3) Garrett’s four out of ten rating on his biophysical profile on November 4, and (4) Dr. Ziegler’s charted desire to deliver the baby as soon as reasonably possible, the jury could have reasonably concluded both the pregnancy and the baby’s health were at risk of intrauterine distress, particularly within the last few weeks of gestation. Likewise, the jury could have reasonably concluded the baby, although not critical or crashing, i.e., dying, was sick, and any delay in delivery, including the “repeated” failure to promptly notify the ordering physician, i.e., within “an hour to half hour” of receipt of the results indicating the lungs were mature, increased the risk of |sharm and, consequently, was a substantial contributing factor to Garrett’s overall injuries, not just the devastating damage to his brain stem. The evidence further does show that, had Dr. Ziegler had the results or had the nurses been able to access the results on the computer at his request on the evening of November 3, 1999, when the mother presented at the hospital with contractions, he could and would have delivered the baby that evening. Likewise, the evidence shows Dr. Wilson, in a similar situation, would have delivered that evening as well.
This is unquestionably a case where the factfinder’s findings were based on its decision to credit the testimony of one of two or more witnesses in light of its observation of the entirety of live testimony. I find the record evidence easily supports a reasonable basis for the jury’s factual conclusions as well as it allocation of 80% fault to the hospital for its repeated and blatant acts of malpractice in not promptly notifying the treating physician of (1) the positive lab test results or (2) the abnormalities in the fetal heart monitor tracings. Its verdict should not be amended simply because the majority finds another award would have been more reasonable.
I understand and appreciate the reality that many times we would have judged the case differently had we been the trier of fact, but this is not our function as a reviewing court. A reviewing court cannot disturb an award because it would have judged the case differently. The manifest error doctrine is not so easily broached. Rarely do we find a reasonable basis does not exist in cases with conflicting views. We have repeatedly noted “it is not hard to prove a reasonable basis for a finding, which makes the manifest error doctrine *120 so very difficult to breach, and this is precisely the function of the manifest error review.” Menard v. Lafayette Ins. Co., 09-1869, pp. 21-22 (La.3/16/10), 31 So.3d 996, 1011. A reviewing court only has the “cold record” for its consideration while the trier of 14fact has the “warm blood” of all the litigants before it. This is why the trier of fact’s findings are accorded the great deference inherently embodied in the manifest error doctrine. As often recited by this Court, “it should be a rare day finding a manifest error breach when two opposing views are presented to the trier of fact.” Id.
Therefore, with the deference accorded by law, I would reinstate the jury’s verdict in its entirety. Accordingly, I respectfully dissent from the majority’s holding to the contrary, but concur in the majority’s affirmation of the jury’s findings on the remaining issues of negligence and causation.