KNOLL, Justice,
dissenting.
hThe majority herein concludes the evidence supports the jury’s finding Dr. Robin Yue did not breach the applicable standard of care by emergently implanting a permanent pacemaker in the plaintiff without ambulatory monitoring or first regulating his prescribed drug therapy. However, after reviewing the entire record in this case, I can only conclude, as did the Court of Appeal, the jury did manifestly err in finding no malpractice. For this reason, I respectfully dissent from the majority’s decision reinstating the jury’s clearly erroneous findings. I would affirm the Court of Appeal’s judgment finding Dr. Yue’s actions fell below the acceptable standard of care.
In a medical malpractice action against a physician, the plaintiff carries a two-fold burden of proof. The plaintiff must first establish by a preponderance of the evidence the doctor’s treatment fell below the ordinary standard of care expected of physicians in his medical specialty, and must then establish a causal relationship between the alleged negligent treatment and the injury sustained. Smith v. State through DHHR, 523 So.2d 815, 819 (La.1988). A determination of whether a physician breached the appropriate standard of care owed to a particular plaintiff depends upon the facts and circumstances of the case. Hunt v. Bogalusa Community Medical Center, 303 So.2d 745, 746 (La.1974). An appellate court may not set aside a trial court’s or jury’s factual finding in the absence of “manifest error” or unless it is “clearly wrong.” Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Thus to reverse a trial court, the reviewing court must find from the record a reasonable factual basis does not exist for the finding, and further the finding is clearly wrong. Mart v. Hill, 505 So.2d 1120 (La.1987). Though the standard of review is high, it does not require the reviewing court to abdicate its responsibility to review the trial court’s findings, nor does it require the court to rubber stamp a jury’s manifestly erroneous findings.
As the majority astutely notes “where the findings are based on determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the findings of fact.” Slip Opinion at 5. This is so because “only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said.” Rosell, 549 So.2d at 844. However, although the manifest error doctrine is not easily broached, “[w]here documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’s story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination.” Menard v. Lafayette Ins. Co., 09-1869, p. 15 (La.3/16/10), 31 So.3d 996, 1008 (quoting Rosell, 549 So.2d at 844-45).
*326 The following is the objective evidence I find so contradictions the defendants’ witnesses. Four physicians, including the three members of the medical review panel and plaintiffs treating cardiovascular surgeon, opined Dr. Yue failed to comply with the appropriate standard of care. One member of the panel, Dr. Tommy Brown, testified on behalf of the entire panel, opining:[1]
I do not [think Snider was a candidate for a pacemaker]. I think that he could have been managed by withholding his beta blocker and withholding his blood thinner.... Again, the big thing that we go back to, is that there’s different beta blockers, there’s different strength of beta blockers, there’s different action of beta blockers. And to say that we need a pacemaker because he requires a beta blocker and he failed one specific beta blocker at one specific dose, I don’t really think that’s what we' do in private practice every day.... I think he should have had a little time to see if his heart rate would have came up.... I think that would have been better served to wait and see if Ms bradycardia persisted. Again, he was stable. He wasn’t in heart failure. He wasn’t having ongoing angina. So I didn’t think that there was an absolute rush to put the pacemaker in that day.
When then asked whether Dr. Yue’s actions complied with the ordinary standard of care for cardiologists, Dr. Brown along with the other two members of the panel found Dr. Yue’s actions did not. See Slip Opinion at 2-3. Dr. Michael Turner, accepted as an expert in implanting cardiology, agreed testifying:
Q. In your opinion, as far as the standard of care dealing with cardiologists implanting pacemakers, between the conservative treatment and implanting the pacemaker on this particular day that Dr. Yue saw him, what is your opinion about the standard of care there?
A. If we define the standard of care as what most implanting cardiologists would have done at that time, it would have been to wait.
Q. Wait and do what?
' A. Observe for a period of time, maybe a day, maybe several days, depending on the course. Very likely withdraw or try to alter drug therapy to alleviate the slow heartbeat.
Moreover, the physician called by defendant, Dr. Freddy Michael Abi-Samra, conceded, as suggested by the national guidelines, the implantation of a permanent pacemaker herein was not “emergent.” Significantly, a document was admitted into evidence entitled “Indications for a Permanent Cardiac Pacing,” listing the classifications for a permanent pacing as established by a joint task force |4formed by the American College of Cardiology, the American Heart Association, and the Heart Rhythm Society. These guidelines set forth three classifications:
Class I — Conditions in which permanent pacing is definitely beneficial, useful, and effective. In such conditions, implantation of a cardiac pacemaker is considered acceptable and necessary, provided that the condition is not due to a transient cause.
Class II — Conditions in which permanent pacing may be indicated but there is conflicting evidence and/or divergence of opinion; class IIA refers to conditions in which the weight of the evidence/opin *327 ion is in favor of usefulness/efficacy, while class IIB refers to conditions in which the usefnlness/efficacy is less well established by evidence/opinion.
Class III — Conditions in which permanent pacing is not useful/effective and in some cases may be harmful.
Symptoms — Patients frequently present for consideration of pacemaker placement because of symptoms that may be due to bradyarrhythmias (e.g. dizziness, lightheadedness, syncope, fatigue, and poor exercise tolerance.) These patients will often have evidence of mild or intermittent sinus node dysfunction or conduction abnormalities. It is critical to attempt to establish a direct correlation between symptoms and bradyar-rhythmias. This is doné via a careful history and ambulatory monitoring.
A direct correlation between symptoms and bradyarrhythmias will increase the likelihood of recommending pacemaker placement. On the other hand, failure to document such a correlation or the presence of an alternative explanation for symptoms will make pacemaker placement less likely or even contraindicated. (Emphasis added).
As the guidelines clearly provide, in non-emergent or non-life threatening situations, like the one herein, a cardiologist should “wait and see” before implanting a permanent pacemaker as a period of monitoring is necessary in order to ensure “the condition is not due to a transient cause.” These guidelines also caution failure to document a direct correlation between symptoms and bradycardia or the presence of an alternative explanation of the symptoms will make pacemaker placement less likely or even contraindicated. Here, the record undeniably shows Dr. Yue did not heed these warnings as he failed to do 15ambulatory monitoring or even determine if Snider’s condition was due to a transient cause, like the beta blockers.
Regarding the proper classification herein and the need for immediate action, Dr. Abi-Samra testified there was a clear indication this was a Class II implantation and as such would “benefit the patient, especially in the lifestyle, rather than the immediate survival or immediate prevention of immediate death.” It was not, according to him, an emergency surgery or anything of that sort, specifically “[i]t was not necessarily emergent.”
Accordingly, the overall testimony and the objective medical evidence establish Snider’s presentation at the emergency room did not call for or require immediate surgery. The objective evidence clearly shows the jury’s factual error as it was not necessarily Dr. Yue’s performance of the procedure that breached the applicable standard, but rather his “rush,” or more appropriately his decision, to perform this particular procedure emergently based solely on the symptoms presented in the emergency room the very same day that constitutes malpractice. Though as the majority finds the evidence does reasonably show a young man at 26 years of age, facing a lifetime of beta blockers and drug therapy, may very well be a candidate for a Class II implantation of a permanent pacing device, that same evidence nevertheless conclusively and objectively establishes the implantation herein was not emergent because plaintiff was stable, not in heart failure, and with no ongoing angina. Thus, under the facts and circumstances of this case, the objective medical evidence clearly shows Dr. Yue breached the ordinary standard of care in his rush to treat the plaintiffs symptoms through the implantation of a permanent pacemaker.
Given the medical guidelines, the medical testimony, and the panel’s undisputed medical findings — all agreeing Dr. Yue *328 rushed the decision for | ¿implantation of a permanent pacemaker without first stopping the patient’s medication and monitoring for possible improvement in heart 'rate — a reasonable fact finder would not have found as this jury did on the issue of breach of the applicable standard of care. The Court of Appeal is an errors correcting court that properly reversed the jury’s verdict in its manifest error review. For these reasons, I would affirm the Court of Appeal.

. The testimony of the .other two members were stipulated to as their testimony would have been identical to Dr. Brown's.