DANIEL L. DYSART, Judge.
|,In this action for damages arising out of an automobile accident, plaintiff appeals a jury verdict in her favor on the basis that the awards for general and special damages are insufficient and should be increased and that the jury’s failure to award the full amount of her medical expenses, in addition to all future medical expenses, was manifestly erroneous. For the reasons that follow, we affirm.
BACKGROUND
On April 23, 2010, plaintiff, Kathleen Hobgood, was involved in an automobile accident with defendant, Jordan Zara. According to her Petition for Damages, on that date, plaintiffs vehicle was rear-ended by Mr. Zara’s vehicle. Plaintiff sued Mr. Zara and his insurer, State Farm Mutual Automobile Insurance Company (“State Farm”), and two uninsured/underinsured motorist carriers — General Insurance Company of America (“GICA”) and Progressive Security Insurance Company (“Progressive”) — for her personal injuries, including a herniated disc in her lower back, and damages related to same.[1]
12Prior to trial, the parties stipulated that the accident was caused solely by Mr. Zara; accordingly, the only issues for trial were the nature of the injuries plaintiff sustained in the accident and the amount of damages to which plaintiff was entitled. A trial before an Orleans Parish jury took place from January 6-9, 2014, resulting in a verdict in plaintiffs favor in the sum of $111,000.00, representing the following:
Past medical expenses.$69,000.00
Future medical expenses_$12,000.00
Past lost wages .$1,000.00
General damages.$25,000.00
Loss of enjoyment of life.$1,000.00
On January 15, 2014, the trial court rendered judgment in accordance with the jury’s verdict. Plaintiff then filed a Motion to Tax Costs which was granted by judgment dated March 25, 2014. Plaintiff timely appealed the judgment.
DISCUSSION

Standard of review

A jury’s factual findings are subject to the manifest error standard of review by an appellate court. Johnson v. Mike Anderson’s Seafood, Inc., 13-0379, p. 12 (La.App. 4 Cir. 6/11/14), 144 So.3d 125, 134, citing Green v. K-Mart Corp., 032495, p. 3 (La.5/25/04), 874 So.2d 838, 842. As we reiterated in Hammond v. Rahsaana, 13-1202, p. 5 (La.App. 4 Cir. 2/26/14), 135 *1247 So.3d 1207, 1210-11, quoting Rabalais v. Nash, 06-0999, p. 4 (La.3/9/07), 952 So.2d 653, 657:
It is well-settled that a court of appeal may not set aside a trial court’s or a jury’s finding of fact ... unless it is clearly wrong.... To reverse a fact-finder’s determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of |sthe trial court, and that the record establishes that the finding is clearly wrong. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Where the jury’s findings are reasonable, in light of the record reviewed in its entirety, the court of appeal may not reverse. Even where the court of appeal is convinced that it would have weighed the evidence differently to reach a different result, reversal of the trial court is improper unless the trial court’s, ruling is manifestly erroneous, or clearly wrong.
It is equally well-settled that, where there are two permissible views of the evidence, a fact-finder’s choice cannot be manifestly erroneous or clearly wrong; thus, an appellate court “must be cautious not to re-weigh the evidence or to substitute its own factual findings” for those of the trial court. Id., quoting Eisenhardt v. Snook, 08-1287, p. 6 (La.3/17/09), 8 So.3d 541, 545. As a reviewing court, we must resolve the issue of whether the fact-finder’s conclusion was reasonable. Id., 13-1202, pp. 5-6, 135 So.3d at 1211, citing Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880, 882 (La.1993).
With these principles in mind, we turn to plaintiffs assignments of error, addressed in the order in which they were raised, after first outlining pertinent testimony and medical evidence adduced at trial.

Medical testimony and evidence

According to plaintiff, immediately after the Friday, April 23, 2010 accident, she was “shaken” but began to have back, neck and left arm pain over the weekend. She was able, however, to return to her employment as the administrative assistant to attorney Morris Bart on Monday. She then began treating with a chiropractor, Dr. Stephen Brower, her daughter had seen previously.
Dr. Brower testified that he initially saw plaintiff on April 27, 2010, for neck, right lower back pain, leg, joint and buttocks pain in April 27, 2010. By August, 2010, plaintiffs neck pain had resolved, but she continued to complain of |4low back pain radiating into the right leg and her buttocks. Plaintiff had an MRI of the lumbar spine on August 24, 2010, which Dr. Brow-er interpreted to be “positive.” The MRI report indicates no nerve root canal contact and “moderate disc bulges [and facet arthrosis] at the lower three lumbar levels” (i.e., at L3-4, L4-5 and L5-S1). Dr. Brower admitted that, at plaintiffs July, 2010 appointment, she reported that her back had improved and that certain testing (straight leg raising test) suggested that there was no disc, problem. Dr. Brower’s records reflect that she had 19 chiropractic treatments from April 28, 2010 through August 6, 2010 (attending 2 sessions a week for 5 of the weeks and once a week for 8 of the weeks).
Dr. Brower recommended that plaintiff see an orthopedist; however, plaintiff next sought medical treatment with Dr. Rand Voorhies, a neurosurgeon, on September 10, 2010, for back pain, radiating into her right buttock and right leg. Dr. Voorhies reviewed plaintiffs MRI and detected an abnormality at the lowest segment of her lumbar spine, which he described as the L5-S1 or L4-L5 “true motion segment.”[2] *1248 Dr. Voorhies opined that the primary source of plaintiffs pain was the facet joint at the L5-S1 segment,[3] where he also noted an annular tear. Dr. Voorhies referred plaintiff to a pain interventionist and she returned to see him approximately a year later, on August 31, 2011. She continued to see him periodically through October, 2012, returned to see him in October, 2013 and last saw him on November 13, 2013.
|rAs of plaintiffs first appointment with Dr. Voorhies, he thought that she was a candidate for surgery and likely discussed it with her at that time. At the least, he discussed surgery with her as early as November, 2010. However, plaintiff testified that she did not want to have surgery “until [she] can’t take the pain anymore.” Dr. Voorhies confirmed that plaintiff indicated that she did not want to undergo surgery at that time.
On cross-examination, Dr. Voorhies admitted that on almost all of plaintiffs examinations with him, plaintiff ranked her pain level as low (although he noted moderate or severe pain on certain occasions as well). He likewise admitted that there was no sign of nerve damage, disc herniation, central canal stenosis or anything pressing on the spinal cord. Dr. Voorhies also admitted that it is probable that “there were some abnormal changes [in plaintiffs spine] that existed prior to the accident” as reflected in the MRI taken four months after the accident. Dr. Voor-hies conceded that, as a neurosurgeon, he has a “bias that surgery is the preferred option for long-term solutions” in cases such as plaintiffs. He agreed that other treatment options would be reasonable, including nerve injections and nerve blocks. He likewise indicated that the surgery he initially recommended would be an elective procedure.
On further cross-examination, when confronted with plaintiffs August, 2013 deposition testimony that she was no longer experiencing daily pain in her buttock and right leg, Dr. Voorhies agreed that this was evidence that she had improvement in her complaints of pain, which “made surgery less likely.” He ultimately could not predict whether surgery would be needed in the future.
During the course of her treatment, plaintiff began seeing Dr. Kevin Martinez, a pain management and physical medicine specialist, on December 8, |fi2011. He performed nerve blocks (medial branch blocks) to evaluate her facet joints and confirm the source of her pain. The first, performed on December 28, 2011, in which the joint was numbed and plaintiff reported feeling better, indicated that the joint was “mostly causing her pain.” Dr. Martinez recommended radiofrequency dener-vations or ablations, which involve burning the nerve to disrupt pain. He performed such a procedure on February 2, 2012, after which plaintiff reported improvement in her back pain, but not in her buttock and leg. He then testified that there was no “gold standard diagnosis of what her pain is caused by.” He then prescribed pain medication for her.
When Dr. Martinez next saw plaintiff on March 8, 2012, she again reported that her back pain was “doing well” but she was having “more intermittent leg pain,” for which he increased her pain medication. Seven and a half months later, plaintiff returned to see Dr. Martinez on October 24, 2012, at which time, she indicated that her pain had begun to increase and she *1249 underwent another denervation. When seen on November 29, 2012, she reported improvement in the leg symptoms but continued back pain. Dr. Martinez felt that plaintiff “probably had a secondary pain generator” based on the fact that she was only having partial improvement in her symptoms. Plaintiff then had a SPECT scan and, when questioned as to whether it confirmed that the facet joint was the source of her pain, Dr. Martinez stated:
Although we’ve confirmed that, yes, where we’ve been working is probably the right area, we can’t say for sure there is nothing causing the residual pain based on this study.
Plaintiff returned to see Dr. Martinez in July, 2013, again reporting that she had been doing well since December but had started having pain again “a little bit 17higher up above the segment [he] had treated.” She had another denervation on July 21, 2018, after which she reported limited relief and mild residual back pain. Because her complaints of pain were at a higher level than previously, Dr. Martinez recommended a medial branch block, which eliminated plaintiffs pain. Dr. Martinez stated that “maybe the residual back pain was due to another joint rather than the disk, the little tear in the disk.” While Dr. Martinez stated that “it’s clear [plaintiff] has a problem at [L5-S1] joint,” “[t]he remainder of the pain is a little up in the air in [his] mind.” He was unable to state what the “second pain generator is.”
On cross-examination, Dr. Martinez admitted that, when he initially saw plaintiff in December, 2011, her examination was normal, except for her complaints of tenderness and pain. He likewise admitted that annular tears can result from everyday life activities (including lifting something heavy, twisting and bending) and that there was no testing performed which could “definitively establish” that the “possible tear at L5-S1” was causing plaintiffs pain, although he stated that the L5-S1 joint is “causing some of her pain.” He, too, agreed that plaintiff has arthritis which pre-dated the accident and that, for almost all of her examinations, plaintiff reported that her pain was intermittent. At the time that he last saw plaintiff, “[s]he was doing better.”
Dr. Susan Glade, a psychiatrist, began treating plaintiff in May, 2012 and last saw her prior to trial in December, 2013. Her initial complaints focused on her complaints of feeling out of control of her life and panic attacks. She prescribed medications for plaintiff, who reported diminished panic attacks 2 weeks later, continued improvement over the next few months and a complete resolution of panic attacks by November, 2012. Plaintiff reported much anxiety over the lawsuit |sand impending trial dates (trial was postponed on at least one occasion). Dr. Glade admitted that plaintiff had been taking anti-anxiety medication before the April, 2010 accident, and that she reported many other stressors in her life.
Plaintiffs internal medicine physician, Dr. Gary Braedt, testified that he had treated plaintiff for several years and had prescribed anti-anxiety medications to plaintiff since 2006. He indicated that he treated plaintiff in 2006 for chronic back pain, and pain on a daily basis. She reported that she would have intermittent pain for 20 seconds at which time the pain was at a level 8 or 9 on a 10-point scale. He saw her on a number of occasions after the April, 2010 accident but it was not until January 17, 2012 (almost two years after the accident) that she mentioned the accident to him. In fact, he saw her on May 26, 2010, approximately a month and a half after the accident, and she did not advise him of the accident. Nor did she mention any back, leg or buttocks pain at the time.
*1250 Dr. Robert Steiner, an orthopedic surgeon who was retained by State Farm to evaluate plaintiff, testified that he reviewed plaintiffs records and diagnosed her with multi-level degenerative lumbar disc disease and facet arthritis, conditions which are not uncommon for someone of plaintiffs age (plaintiff was 57 at the time of trial). Dr. Steiner, too, saw no evidence of disc herniations and in reviewing her MRI of August, 2010, he stated that saw no “fissure or tear of the disc.” He further indicated that, had plaintiff sustained a tear or a fissure of a disc, he would expect that to have shown on an MRI within four to six months of the accident. He indicated that plaintiffs arthritis would have pre-dated the accident by at least six or seven years and he opined that the accident caused an aggravation of plaintiffs arthritis.
|flIn Dr. Steiner’s examination of plaintiff, while she reported complaints of tenderness, he detected no spasms, no weakness and no evidence of a pinched nerve or sciatic nerve pain. He found no truly objective findings on examination (although her range of motion was limited; this is largely an objective finding, given that the physician “ask[s] the patient to give their best effort in bending forward or bending backwards,” he must “rely[ ] on the patient to do their best”).
Dr. Steiner testified that surgery is not warranted, given that surgery is indicated only with “appropriate physical findings such as a neurological problem,” appropriate diagnostic studies and failed conservative treatment. In plaintiffs case, he found an absence of such findings and recommended that plaintiff remain active, avoid heavy lifting, use anti-inflammatory medications when her arthritis is “acting up,” and pain medications as needed, as well as weight loss and physical therapy and rehabilitation. According to Dr. Steiner, plaintiff should have had rehabilitation after her radiofrequency ablations, when she had diminished pain, in order to build her muscles. He did not recommend any further testing unless plaintiffs condition changed.
Dr. Steiner further testified that, based on the degree of degeneration reflected on plaintiffs x-rays, he would not have been surprised for plaintiff to have had back pain even in the absence of the accident. In reviewing plaintiffs x-rays, he noted spurring, a degenerative change, in almost all of plaintiffs vertebrae, facet arthritis at almost all joint levels, disc narrowing at all levels (from a mild to a moderate degree), all of which pre-dated the accident and which began to develop ten years before the accident. Those findings were present on the x-rays taken on April 28, 2010, five days after the accident. He did assign an 8 percent impairment “to the whole person as a result of her ongoing complaints associated |inwith the aggravation of arthritis in her back.” That assessment was based upon plaintiffs being truthful in her reports that she had no problems before the accident.
On cross-examination, Dr. Steiner admitted that degenerative changes do not always cause symptoms. He likewise agreed that, based upon the history plaintiff reported, the accident caused her to become symptomatic and he had “no quarrel” with the treatment she had received.

Future medical expenses

Plaintiff first asserts that the jury’s award of $12,000 for future medical expenses was inadequate. Plaintiff contends that the uncontroverted testimony at trial was that she will need certain treatment, including radiofrequency ablations every year for .the remainder of her life or surgery. According to Dr. Voorhies, plaintiff would be a candidate for a lumbar fusion, the total cost of which would be approximately $110,440. Otherwise, the projected *1251 cost of annual radiofrequency ablations, according to Dr. Shael Wolfson, plaintiffs expert economist, would be $109,977, a sum based upon figures provided to him by Dr. Kevin Martinez.
In a personal injury action, a plaintiff may recover special damages, including future medical expenses; however, it is the plaintiffs burden of proving that those expenses will more probably than not be incurred. Menard v. Lafayette Ins. Co., 09-1869, p. 12 (La.3/16/10), 31 So.3d 996, 1006, citing Stiles v. K Mart Corp., 597 So.2d 1012, 1012 (La.1992). As the Menard Court further explained:
[I]t is well acknowledged an award for future medical expenses is in great measure highly speculative and not susceptible to calculation with mathematical certainty. Highlands [Ins. Co. v. Missouri Pacific R. Co., 532 So.2d 317, 324 (La.App. 3d Cir.1988) ].... It follows, therefore, such awards “generally do not involve determining the amounts, but turn on questions of credibility and L,inferences, i.e., whose experts and other witnesses does the jury believe?” [Frank L. Maraist & Thomas C. Galligan, Jr., Louisiana Tort Law] § 7.02, 7-4.
In accordance with well-established law, much discretion is left to the judge or jury in its assessment of quantum, both general and special damages. La. Civ. Code. art. 2324.1 (“In the assessment of damages in cases of offenses, quasi offenses ... much discretion must be left to the judge or jury.”); Guillory [v. Lee], 09-0075 [, p. 14, 16 So.3d at] 1116.
Id., pp. 13-14, 31 So.3d at 1006-07.
As the Louisiana Supreme Court has indicated, in order to alter a jury’s factual conclusions with regard to special damages, including future medical expenses, “an appellate court must satisfy a two-step process based on the record as a whole: There must be no reasonable factual basis for the trial court’s conclusions, and the finding must be clearly wrong.” Kaiser v. Hardin, 06-2092, pp. 12-13 (La.4/11/07), 953 So.2d 802, 810, citing. Guillory v. Insurance Co. of North America, 96-1084, p. 5, (La.4/8/97), 692 So.2d 1029, 1032. In that regard, “[credibility determinations are for the trier of fact, even as to the evaluation of expert witness testimony.” Green v. K-Mart Corp., 03-2495, p. 5 (La.5/25/04), 874 So.2d 838, 843, citing Sportsman Store v. Sonitrol Sec. Systems, 99-0201 p. 6 (La.10/19/99), 748 So.2d 417, 421; Lirette v. State Farm Ins. Co., 563 So.2d 850, 853 (La.1990). Furthermore, “[a] fact-finder may accept or reject the opinion expressed by an expert, in whole or in part.” Id., citing Lirette, 563 So.2d at 855. Moreover, a jury “may substitute common sense and judgment for that of an expert witness when such a substitution appears warranted on the record as a whole.” Id., citing Sportsman Store, 99-0201 p. 9, 748 So.2d at 422.
In awarding plaintiff only $12,000 in future medical expenses, it is clear that the jury either rejected the testimony of plaintiffs experts concerning the need for | ^extensive future medical treatment or rejected the contention that extensive future medical treatment was necessitated by the April, 2010 accident. After reviewing the record in its entirety, we cannot say that the jury’s award for future medical expenses was clearly wrong.
As previously discussed, while Dr. Voor-hies indicated that surgery was an option, he also testified that it was an elective procedure and that he could not predict whether surgery would be needed in the future. Plaintiff, too, testified that she was not interested in surgery. Moreover, Dr. Steiner directly stated that, in plaintiffs case, surgery was neither necessary nor warranted. Clearly, plaintiff did not *1252 prove that surgery, and its cost, will more probably than not be incurred in the future.
Similarly, with respect to the recommendation that plaintiff undergo periodic ra-diofrequency ablations for the remainder of her life, the jury heard Dr. Steiner testify as to alternate treatments, including that plaintiff remain active, lose weight, avoid heavy lifting, undergo physical therapy and use medications as needed. Given that the jury was offered more than one option concerning plaintiffs future need for medical treatment, we cannot say that, in rejecting plaintiffs claim for the costs of annual radiofrequency ablations, it was clearly wrong. This is particularly the case when considering that the jury heard other testimony, discussed infra, regarding plaintiffs abilities and given its right to “substitute common sense and judgment ... when such a substitution appears warranted on the record as a whole.” Green, 03-2495, p. 5, 874 So.2d at 843. Likewise, while Dr. Voorhies and Dr. Martinez testified that plaintiff has problems with the facet joint at L5-S1, Dr. Martinez also testified that testing reflected problems with another, higher level, and he ultimately could not state the source of the “second pain generator.” Dr. 11sMartinez’s treatment, commencing a year and 8 months after the accident, and identifying an altogether new level.causing pain, could clearly lead the jury to believe that her pain at that time was no longer caused by the April, 2010 accident.
While the basis of the jury’s award for future medical records is not clear from the record, it is evident that it believed plaintiff would likely have some medical needs in the future, for which it felt that $12,000 would cover. As the.Supreme Court found in Menard, “the jury made a factual finding [plaintiff] was not permanently injured or impaired from the accident, and consequently, the jury awarded [plaintiff] some of the future medical expenses.” Menard, 09-1869, p. 16, 31 So.3d at 1008. Similarly, “[t]he jury accepted the positions advanced by both parties and awarded damages consistent with an injury not as severe as plaintiff alleged, but not as minimal as defendants alleged.” Id. Future medical expense “awards ‘generally do not involve determining the amounts, but turn on questions of credibility and inferences, i.e., whose experts and other witnesses does the jury believe?’” Id., 09-1869, p. 13, 31 So.3d at 1006 (Citations omitted). We find, as did the Menard Court, that the jury was not manifestly erroneous in its award for future medical expenses. Id., 09-1869, p. 22, 31 So.3d 996, 1011.

Past medical expenses

Plaintiff next contends that the jury erred in failing to award the’ full amount of the medical expenses she incurred, stating the amount to be $69,987.48, as compared to the jury’s award of $69,000. However, even plaintiffs own medical bill summary which was admitted into evidence reflects a total of $68,987.48 in medical expenses. This is also the amount plaintiffs counsel requested of the jury in closing argument. Accordingly, while it appears that the jury “rounded up” the [ 14amount of past medical expenses and awarded an additional $12.52, we are not inclined to disturb the jury’s award.

Lost wages

In her third assignment of error, plaintiff contends that the jury erred in awarding her only $1,000 for her lost wages. Based on her testimony that, as a result of the accident, she missed 212 hours of work to attend doctor’s appointments for which her pay was docked, plaintiff maintains that she should have *1253 been awarded $7,176 in lost wages. Plaintiff arrived at this sum by taking her then-annual salary, dividing it by the number of weeks in a year, and then multiplying the number of weeks she missed work by her weekly salary. She maintains that, because her testimony was uncontradicted, the jury had to accept it as true.
The record reflects that plaintiffs testimony was that the time she missed work was deducted from her sick time or vacation time. While plaintiff testified that she has four weeks of vacation and one week of personal time each year, and she prepared a document summarizing the dates on which she received medical treatment (described by plaintiffs counsel in questioning plaintiff as “the total number of hours [she] believe[d] [she] missed”), there was no testimony as to how plaintiffs vacation time or sick leave was actually used by the time spent attending doctor’s visits. Moreover, the evidence was that plaintiff received raises in her salary every year, including the years after the accident, in addition to an annual Christmas bonus.
Our jurisprudence reflects that the plaintiff bears the burden “of proving the time missed from work as a result of the injury.” Hammons v. St. Paul, 12-0346, p. 9 (La.App. 4 Cir. 9/26/12), 101 So.3d 1006, 1012. “Past lost wages are | ^susceptible of mathematical calculation, and the award is not subject to the much discretion standard.” Id. (Citation omitted). See also Rathey v. Priority EMS, Inc., 04-0199, p. 51 (La.App. 4 Cir. 1/12/05), 894 So.2d 438, 471.
While we find that plaintiff did not offer sufficient proof of a lost wage claim in this matter, we will not disturb the jury’s award of $1,000, given State Farm’s concession of the award (in its brief, State Farm stated that “[t]he jury’s action [in “reducing] the amount of the lost wages” is supported by Louisiana jurisprudence.”

General damages

Finally, plaintiff maintains that the jury committed manifest error in awarding only $4,000 for plaintiffs loss of enjoyment of life claim and $25,000 for her pain and suffering claim. Because both claims fall within the spectrum of general damages, we address them together. See McGee v. A C And S, Inc., 05-1036, pp. 3-4 (La.7/10/06), 933 So.2d 770, 774 (“general damages as ‘those which may not be fixed with any degree of pecuniary exactitude but which, instead, involve mental or physical pain or suffering, inconvenience, the loss of gratification of intellectual or physical enjoyment, or other losses of life or lifestyle which cannot really be measured definitively in terms of money,’ ” citing Duncan v. Kansas City S. R.R., 00-0066, p. 13 (La.10/30/00), 773 So.2d 670, 682; Boswell v. Roy O. Martin Lumber Co., Inc., 363 So.2d 506, 507 (La.1978); Anderson v. Welding Testing Lab., Inc., 304 So.2d 351, 352 (La.1974)). See also Parker v. Robinson, 05-0160, p. 1 n. 2 (La.App. 4 Cir. 2/22/06), 925 So.2d 646, 648 (“ ‘[g]eneral damages’ are those damages that are inherently speculative in nature and cannot be fixed with mathematical certainty, including pain and suffering”). We recognize that a jury may be allowed to give a separate award for |lfiloss of enjoyment of life, as the jury did in the instant case. McGee, 05-1036, p. 11, 933 So.2d at 779.
In Reeves v. Grove, 10-1491, p. 4 (La.App. 4 Cir. 9/21/11), 72 So.3d 1010, 1013, we stated:
... When damages are not susceptible to precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages. La. C.C. art. 1999. In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the *1254 judge or jury. Id.; La. C.C. art. 2324.1. This discretion is great, even vast, and an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993).
In Guillory v. Lee, 09-0075, p. 14 (La.6/26/09), 16 So.3d 1104, 1116, the Court reiterated the long-held tenet that a jury has “great discretion” in assessing damages and that a jury’s assessment of damages is “a determination of fact” which is “entitled to great deference on review.” Accordingly, when reviewing general damage awards, our role is to review the trier of fact’s exercise of discretion, not to decide what we consider to be an appropriate award. Youn, 623 So.2d at 1260. If there is no clear abuse of discretion in the jury’s awards, the awards must stand. Coco v. Winston Indus., Inc., 341 So.2d 332, 335 (La.1976).
Having reviewed the record, we do not find a clear abuse of the jury’s discretion. While plaintiff testified as to her injuries and the manner in which her life has been affected by the April, 2010 accident, the jury heard other evidence which called into question the severity of her injuries. First, plaintiff testified that, while she missed work to attend doctors’ appointments, she answered in the negative to the question of whether she ever “just felt so bad that ... [she] couldn’t come in to work.” The jury also heard testimony regarding plaintiffs vacation home in Florida, purchased in 2012, to which she and her husband travel three or four times a month. Similarly, since the accident, plaintiff has taken a number of 117out-of-town trips, including an Alaskan cruise (including “shore excursions and sightseeing”) and trips to Ireland, the Turks and Caicos Islands, Mexico, a Mediterranean cruise and Washington, D.C. Likewise, plaintiff has continued to reside in an upstairs apartment since the accident for which she is required to walk up stairs.
The jury also weighed the testimony of the various doctors who all agreed that the condition of plaintiffs spine pre-existed the accident, and as early as 2006, plaintiff was seen for “chronic back pain.” Dr. Steiner testified that, given plaintiffs pre-existing degenerative condition, he would not have been surprised for plaintiff to have had problems with her back and felt that it was “very likely” that plaintiff would have had problems in the future “even had this accident not occurred.”
The jury may have found it suspect that plaintiff did not mention the accident, or any back, buttock or leg complaints to Dr. Braedt, who has been her internal medicine doctor since 2006, when she saw him just a month and a half after the accident, even though he had previously treated her for chronic back pain. It was almost two years after the accident that plaintiff advised Dr. Braedt of the accident.
The jury also weighed evidence of plaintiffs mental health issues both prior to and after the accident. While plaintiff testified that she had been trying to wean herself off her anti-anxiety medication prior to the accident, her testimony was contradicted by the medical records evidencing that she continually received the same dosage of medication up to the time of the accident. Plaintiff also noted a number of stressors, other than the accident, which contributed to mental health issues.
[1RAs is reflected in its awards, the jury either did not believe plaintiffs injuries to be as significant as claimed, or believed that they were related to the nature of her pre-existing degenerative condition. Either way, the jury, as the trier of fact, “is afforded much discretion in assessing the facts and rendering an award because it is in the best position to evaluate witness credibility and see *1255 the evidence firsthand.” Joseph v. Archdiocese of New Orleans, 10-0659, p. 9 (La.App. 4 Cir. 11/10/10), 52 So.3d 203, 208-09 (emphasis added). Given the jury’s “ ‘great,’ and even vast,” discretion, Id., 10-0659, 52 So.3d at 208, we find no manifest error in the jury’s awards for general damages or loss of enjoyment of life.
CONCLUSION
For the reasons discussed, we conclude that the jury’s findings are reasonable, in light of the record reviewed in its entirety. We therefore affirm the trial court’s judgment.
AFFIRMED.

. Plaintiff sought damages for past and future mental anguish and physical suffering, loss of enjoyment of life, medical care and lost earnings and/or impaired earning capacity.
Progressive was dismissed from the suit on August 23, 2012, after entering into a stipulation with plaintiff that, should she recover the full amount of State Farm's liability insurance policy, Progressive would pay plaintiff the limits of its policy. Plaintiff then dismissed GICA in Februaiy, 2013.

. According to Dr. Voorhies, the L5-S1 segment is the same as the L4-L5 segment: they describe the same segment. That is, where *1248 some medical professionals refer to this segment as the L5-S1 level, others refer to it as the L4-L5 level.

. Dr. Voorhies indicated that "the joint system in the spine is the disc in the front and the two facet joints in the back.”