CY WILLIAMS

VERSUS

MATHEW ALEXANDER, III AND ROUSSEL
FARMS, INC.

NO. 24-CA-492

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE FORTIETH JUDICIAL DISTRICT COURT
PARISH OF ST. JOHN THE BAPTIST, STATE OF LOUISIANA
NO. 72,93, DIVISION "A"
HONORABLE VERCELL FIFFIE, JUDGE PRESIDING

October 17, 2025

**SCOTT U. SCHLEGEL**
**JUDGE**

Panel composed of Judges Susan M. Chehardy,
Stephen J. Windhorst, and Scott U. Schlegel

<u>**AFFIRMED IN PART; REVERSED IN PART**</u>

    **SUS**
    **SMC**
    **SJW**



FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Morgan Waquin
Deputy, Clerk of Court

COUNSEL FOR DEFENDANT/APPELLANT,
ROUSSEL FARMS, INC.

    James K. Ordeneaux
    Scott H. Mason
    Matthew T. Habig

COUNSEL FOR PLAINTIFF/APPELLEE,
CY WILLIAMS

    Willie G. Johnson, Jr.
    Sophia J. Riley

**SCHLEGEL, J.**

Defendants, Roussel Farms, Inc., Louisiana Farm Bureau Mutual Insurance Company, and Southern Farm Bureau Casualty Insurance Company, appeal the jury's award of future medical expenses, mental anguish damages, and punitive damages in favor of plaintiff, Cy Williams. For reasons stated more fully below, we affirm the awards for future medical expenses and mental anguish, and reverse the jury's award of punitive damages under La. C.C. art. 2315.4.

**FACTS AND PROCEDURAL BACKGROUND**

This matter involves a collision between a train locomotive driven by plaintiff, Cy Williams, and a farm tractor owned by defendant, Roussel Farms, Inc., which was driven by Roussel Farms' employee, Matthew Alexander, on the morning of November 12, 2017. The collision occurred in St. John the Baptist Parish near Highway 3212 and the intersecting railroad. The red lights were flashing, the crossing arms were down, and audible signals were activated. The train horn was also sounding. Despite these warnings, Mr. Alexander drove through the crossing arms and onto the tracks directly in front of the train. Mr. Alexander was killed in the collision.

Mr. Williams filed a petition for damages against Roussel Farms and its liability insurers seeking to recover damages for alleged physical and psychological injuries, including post-traumatic stress disorder (PTSD), under theories of negligence, intentional/negligent infliction of emotional distress, and vicarious liability. Mr. Williams also asserted that defendants were vicariously liable for punitive/exemplary damages under La. C.C. art. 2315.4 based on allegations that Mr. Alexander was allegedly operating the tractor while under the influence of cocaine and cannabinoids at the time of the collision.

On July 6, 2020, Mr. Williams filed a motion for partial summary judgment seeking a determination that urinalysis tests obtained by the coroner established

that Mr. Alexander had significant levels of cocaine metabolites and cannabinoids in his system at the time of the accident. On October 27, 2020, the trial court denied the motion for partial summary judgment finding that "the toxicology report was not definitive but only presumptive, as to the presence of cocaine and cannabinoids in Matthew Alexander, III's system at the time of the accident."

On December 22, 2020, defendants also filed a motion for partial summary judgment requesting dismissal of Mr. Williams' claim for exemplary/punitive damages because confirmatory drug tests were negative. On May 28, 2021, the trial court denied the motion finding that the issue "should be left to the jury for deliberation." Defendants filed a writ application with this Court, which we denied. *Cy Williams v. Matthew Alexander*, 21-423 (La. App. 5 Cir. 10/15/21) (unpublished writ disposition), *writ denied*, 21-1681 (La. 1/19/22), 331 So.3d 332.

The matter was set for a jury trial on March 20, 2023. The parties had entered into prior stipulations on the issue of liability by agreeing 1) that Mr. Alexander was 100% responsible for causing the collision by improperly operating the tractor at the railroad crossing; and 2) that Mr. Williams did not have an opportunity to avoid the hazard created by Mr. Alexander. The parties also agreed that Mr. Alexander was in the course and scope of his employment at the time of the accident.

On March 25, 2023, following a six day trial, the jury returned a verdict in favor of Mr. Williams awarding a total of $650,000.00. The award included:

| | |
|---|---|
| Past physical pain and suffering | $ 90,000.00 |
| Future physical pain and suffering | $ 45,000.00 |
| Past medical expenses | $100,000.00 |
| Future medical expenses | $150,000.00 |
| Mental anguish, stress and anxiety due to physical injuries | $ 60,000.00 |

| Mental anguish, stress and anxiety due to witnessing Alexander die | $ 50,000.00 |
|---|---|
| Loss of enjoyment of life | $ 50,000.00 |
| Exemplary Damages | $105,000.00 |

The trial court signed a judgment adopting the jury's verdict on April 4, 2023.  On May 8, 2023, defendants filed a motion for suspensive appeal, which the trial court granted on May 15, 2023.  The appellate record was lodged in this Court on October 17, 2024, and the matter was remanded for supplementation of the record, which was completed on April 17, 2025.

On appeal, defendants seek a reduction of the damages awarded by the jury in the amount of $305,000.00.  Specifically, defendants contend that the awards for future medical expenses ($150,000.00), mental anguish for witnessing Mr. Alexander's death ($50,000.00), and punitive damages ($105,000.00) are legally improper.

## LAW AND ANALYSIS

*Future Medical Expenses*

In their first assignment of error, defendants argue that the jury and trial court erred by awarding Mr. Williams future medical expenses in the amount of $150,000.00.  Defendants contend that the award is not warranted because it is premised on testimony from Mr. Williams' expert life care planner, Elizabeth Peralta, and an economist, Dr. Randolph Rice, which the trial court should have excluded.[1]  Defendants specifically argue that it was error to allow their testimony because: 1) Mr. Williams failed to disclose Ms. Peralta as an expert in accordance with deadlines set forth in the scheduling order; 2) Ms. Peralta testified to future medical expenses contained in a later version of the life care plan that was never

---
[1] Life care planners consult with health care providers to assess and develop plans for an individual's future medical needs and establish a valuation for the future care.

disclosed to defendants; and 3) Mr. Williams' economist, Dr. Rice, testified via a video deposition regarding the present value of future medical expenses contained in an earlier version of the life care plan. Defendants argue that they were prejudiced by these errors because they led to a confusing and convoluted scenario where the present values provided by the economist's deposition testimony did not correlate with the future medical expense opinions presented by the life care planner at trial, which were based on a report never produced to defendants.

**<u>Untimely Substitution of Life Care Planner</u>**

The certified life care planner Mr. Williams originally retained, Dr. Lacy Sapp, suffered a medical issue in August 2021, and was unable to testify. As a result, Elizabeth Peralta, another certified life care planner with Dr. Sapp's firm, assumed responsibility for Dr. Sapp's files. Unfortunately, plaintiff's counsel did not inform defense counsel that Ms. Peralta would testify in Dr. Sapp's place until less than two weeks prior to the March 20, 2023 trial. The scheduling order issued by the trial court required Mr. Williams to produce expert reports by November 15, 2022, and to provide a final witness list by January 3, 2023.

In response to the late disclosure, defendants filed a motion to strike Ms. Peralta, as well as Mr. Williams' expert economist, Dr. Rice, from testifying at trial, arguing that Ms. Peralta should not be permitted to testify because Mr. Williams failed to comply with the deadlines related to experts. Defendants further argued that Ms. Peralta did not even author an expert report and that Mr. Williams could not show good cause for his untimely disclosure of her substitution as an expert witness. Defendants claimed that Mr. Williams knew about Dr. Sapp's incapacity to testify back in 2021, and had ample time to have Ms. Peralta prepare her own report and disclose her identity to defendants. In addition, defendants argued that Ms. Peralta should not be allowed to testify about the contents of Dr. Sapp's reports because Ms. Peralta did not participate in the preparation of the

expert reports, and her testimony would amount to inadmissible hearsay. Defendants argued that they were prejudiced by the untimely disclosure because they did not have adequate time to prepare a defense or to determine whether they should depose Ms. Peralta. Finally, defendants argued that if the trial court excluded Ms. Peralta's testimony, then it should also exclude testimony from Dr. Rice, because his present value calculations were based on the life care plan prepared by Dr. Sapp.

The trial court heard oral argument on defendants' motion to strike prior to the start of the first day of trial, during which defense counsel reiterated the arguments raised in their motion to strike and further argued that they would be prejudiced due to their inability to effectively cross-examine the recommendations rendered by Dr. Sapp because Ms. Peralta did not prepare the life care report.

Plaintiff's counsel argued in response that Ms. Peralta worked in the same firm as Dr. Sapp, Stokes & Associates, and had assumed all of Dr. Sapp's cases. He further argued that defendants were not prejudiced because they had access to the information contained in the reports for over a year and a half and Ms. Peralta's testimony would be limited to these reports. He finally argued that defendants had not previously sought to depose Dr. Sapp, or anyone with her firm, and did not issue any subpoenas to obtain information related to the reports. Counsel also noted that defendants recently had the opportunity to cross-examine Mr. Williams' economist, Dr. Rice, during his trial perpetuation deposition held on March 10, 2023. Following oral argument, the trial court denied the motion to strike, reasoning that Dr. Sapp was unavailable due to her illness and that defendants had not challenged the reliability or trustworthiness of the recommendations for future medical expenses rendered in Dr. Sapp's reports.

On appeal, defendants first argue that this Court should reverse the future medical expenses award based on Mr. Williams' failure to identify Ms. Peralta as

an expert witness in accordance with the deadlines set forth in the scheduling order.

La. C.C.P. art. 1551 provides the trial court with great discretion in implementing pre-trial orders and ensuring their enforcement. *Cobena v. ACE Am. Ins. Co.*, 21-630 (La. App. 5 Cir. 8/3/22), 347 So.3d 1117, 1125, *writ denied*, 22-1337 (La. 11/16/22), 349 So.3d 1007. The theory inherent in pre-trial procedure is avoiding surprise and ensuring orderly disposition of the case. *Moonan v. Louisiana Med. Mut. Ins. Co.*, 16-113 (La. App. 5 Cir. 9/22/16), 202 So.3d 529, 533, *writ denied*, 16-2048 (La. 1/9/17), 214 So.3d 869. A pre-trial order controls the subsequent course of the action, but can be modified to prevent manifest injustice. La. C.C.P. art. 1551(B); *Perniciaro v. Hamed*, 20-62 (La. App. 5 Cir. 12/16/20), 309 So.3d 813, 833. Absent an abuse of discretion, the trial court's decision to admit or exclude evidence upon objection on the grounds of failure to abide by the pre-trial order will be upheld. *Cobena*, 347 So.3d 1125-26.

While the trial judge has great discretion in deciding whether to receive or refuse testimony objected to on the grounds of failure to abide by the pre-trial order, any doubt is resolved in favor of receiving the information. *Perniciaro*, 309 So.3d at 833; *Moonan*, 202 So.3d at 533. This Court has stated, "[i]n deciding whether to modify a pretrial order, a trial court must be ever mindful of the fact that the objective of our legal system is to render justice between litigants upon the merits of the controversy rather than to defeat justice upon the basis of technicalities." *Henderson on behalf of Rolland v. Ruffino*, 17-158 (La. App. 5 Cir. 10/25/17), 231 So.3d 912, 922.

Mr. Williams' expert life care planner suffered a serious health issue, which caused another life care plan expert in her firm to help out and assume her files. Defendants argued that Ms. Peralta had no involvement in preparing Mr. Williams' life care plan. Ms. Peralta, however, testified that she worked hand-in-hand with

Dr. Sapp for 10 years, wrote reports with her, and supervised her team. In addition, when the trial court ruled on the motion to strike at the outset of the trial proceedings, Mr. Williams' counsel represented that Ms. Peralta's testimony would be limited to the information contained in Dr. Sapp's life care plan reports that they had produced to defendants. Defendants' primary argument in support of the motion to strike was that the untimely disclosure deprived them of the opportunity to adequately prepare a defense and determine whether to depose Ms. Peralta. Defendants though, had long had access to the reports that supposedly formed the basis for the future medical expense recommendations, but decided not to depose Dr. Sapp; nor did they argue that they attempted to depose Ms. Peralta in the two weeks prior to trial.

Considering the arguments presented and information available to the trial court at the time it denied defendants' motion to strike, we do not find that the trial court abused its vast discretion by denying the motion.

### Undisclosed Life Care Plan Report and Limited Cross-Examination

Unfortunately, the issues relating to Ms. Peralta's and Dr. Rice's expert testimony were further complicated when the parties discovered during trial that neither party had the most updated version of Dr. Sapp's life care plan.

Mr. Williams provided defendants with Dr. Sapp's life care plan reports dated June 19, 2020, and January 13, 2021.[2] However, Mr. Williams did not produce an updated life care plan report prior to the March 2023 trial.[3] At the end of Ms. Peralta's brief direct examination, plaintiff's counsel asked her to provide the total future medical expenses calculated in the life care plan as recommended by Mr. Williams' treating orthopedic surgeons and by Dr. Maxine Campbell-Flint

---

[2] Apparently, these reports were provided in advance of the prior trial dates set in June and August 2021.

[3] The use of a two-year old life care plan and the lack of a comprehensive plan contributed greatly to the confusion regarding the issue of future medical expenses at trial.

and Carmen Spooner with Innercore Management Group, who previously provided psychological counseling and treatment to Mr. Williams.[4]  Ms. Peralta testified that the range of future medical costs calculated in the life care plan was $388,516.63 on the low end and $580,162.06 on the high end.  She explained that the report provided a range based on various treatment costs obtained from Mr. Williams' health care providers and surveys of other vendors, as well as the range of frequency and duration of treatment recommended by the providers.

Immediately following this testimony, defense counsel objected and asked to approach the bench.  The transcript indicates that an "off the record discussion" occurred, which was not transcribed.  When the parties went back on the record, defense counsel indicated that she was making "a formal objection at this time, that the witness is testifying outside the scope of the report that she was ordered to testify within the scope of."[5]  On cross-examination, Ms. Peralta explained that the last life care plan report that Dr. Sapp created was not from January 2021, but June 3, 2021.  Ms. Peralta later confirmed that the range of future medical costs she testified to on direct examination was based on the June 2021 report.[6]

Following Ms. Peralta's testimony revealing that a later version of Dr. Sapp's life care plan report existed, defense counsel again asked to approach the bench for an off the record discussion.  When the parties went back on the record,

---

[4] As discussed more fully below, the range of future medical expenses recommended by Ms. Peralta did not include the future medical expenses that Mr. Williams also sought to recover for mental health counseling and treatment with Dr. Chrysanthe Parker.  Dr. Parker diagnosed Mr. Williams with extreme PTSD and the jury heard testimony indicating that future treatment with Dr. Parker was projected to cost over $800,000.00 for the remainder of Mr. Williams' life.

[5] The court minutes and transcripts contained in the appellate record provided to this Court do not reflect an order by the trial court limiting Ms. Peralta's testimony to a specific report.  However, plaintiff's counsel represented during oral argument on the motion to strike heard just prior to the start of trial that Ms. Peralta would testify to the substance of the life care plan reports from 2020 and "the early part of 2021."  Further, prior to the start of Ms. Peralta's direct examination, plaintiff's counsel represented that Ms. Peralta was informed that she would "only be testifying to the report prepared by Dr. Lacy Sapp when she was with us and working in the case."  In addition, during back and forth between counsel on an objection, defense counsel mentioned that she was asking Ms. Peralta questions "contained solely within that January of 2021 report as Your Honor already ruled."

[6] The various versions of the life care plan reports are not included in the record so we are not able to compare the differences between them.

defense counsel objected on the grounds that Mr. Williams did not produce the June 2021 report during discovery and further objected to any testimony from Ms. Peralta based on the June 2021 report. Plaintiff's counsel responded that he also had not received the June 2021 report, and that the Stokes firm had made the decision to assign Ms. Peralta to this case. The transcript does not reflect whether the trial court rendered a ruling on defendants' objection regarding the undisclosed expert report. However, it appears that the trial court denied the objection during the bench conference because defense counsel proceeded with cross-examination after placing the objection on the record.

Defense counsel then attempted to ask Ms. Peralta a series of questions regarding whether certain specific expenses should be deducted from the recommended future medical expense amounts because Mr. Williams had either 1) not pursued the recommended treatment in the two years since Dr. Sapp's last report, such as costs for recommended physical therapy; or 2) had already received the recommended medical treatment in the last two years, such as radiofrequency ablations (RFAs) (or rhizotomies), based on the medical records in evidence. Plaintiff's counsel objected on grounds that the questions required a medical opinion or went beyond the scope of the reports agreed to by the parties. Defense counsel responded that she was trying to determine the basis for the future medical costs testified to by Ms. Peralta, and further complained that the trial court was denying defendants the opportunity to conduct meaningful cross-examination. The parties engaged in extensive discussions regarding the objections in the presence of the jury.[7] The trial court sustained plaintiff's counsel objections to these specific questions and instructed defense counsel to "stick" to the plan.

---

[7] We observe that the trial court allowed the parties to engage in extensive speaking objections and arguments in the presence of the jury throughout the trial. La. C.E. art. 103(C) clearly provides that "[i]n jury cases, proceedings shall be conducted, to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by any means, such as making statements or asking questions in the hearing of the jury."

Defense counsel was able to ask Ms. Peralta general questions regarding whether it would be important to update a life care plan to reflect changes in the client's needs. Ms. Peralta admitted that she had not consulted with Mr. Williams' providers and had no knowledge regarding treatment he may have received. But she explained that that if new information became available indicating a need for a change in future medical care, she would generally consult the physicians again and update the report. She also agreed that if Mr. Williams had already received recommended treatment included in the 2021 life care plan report, then the costs should be deducted from the amount of the future medical expenses she recommended. However, Ms. Peralta stated that she was not authorized to complete a new life care plan for Mr. Williams and was advised to limit her testimony to Dr. Sapp's prior reports. The cross-examination ended when defense counsel attempted to ask Ms. Peralta if the numbers she provided from the June 2021 report were still accurate as of the time of trial. The question was again met with objections, which the trial court sustained.

After Ms. Peralta testified, Dr. Rice testified by video deposition. Prior to the start of the video, defendants lodged an objection arguing that Dr. Rice's present value calculations had no foundation or basis in the evidence because they were based on projected future medical expenses that were different than the numbers Ms. Peralta testified to at trial. Defendants thus argued that this testimony was prejudicial and lacked probative value. The trial court did not render a ruling on the record, but presumably the objection was denied, because the trial court allowed Mr. Williams to present the entire video deposition to the jury.

During his testimony, Dr. Rice testified that the present value of the future medical expenses recommended for Mr. Williams by the life care planner was a range of $223,021.00 to $380,512.00. However, he explained that these

calculations were based on Dr. Sapp's 2020 life care plan report.[8]  Dr. Rice also

separately testified that the present value for ongoing mental health care treatment

recommended by Dr. Chrysanthe Parker was $883,676.00 based on his life

expectancy of 28.73 years at the time of trial.   He confirmed that Dr. Sapp's 2020

life care plan report did not include recommendations regarding future care with

Dr. Parker.

On appeal, defendants argue that the trial court erred by allowing Ms.

Peralta to testify regarding a life care plan never provided to them.[9]  Defendants

further contend that the trial court improperly limited their cross-examination of

Ms. Peralta, and that her testimony lacked foundation due to her lack of personal

knowledge of the contents of the plan.  Finally, they contend that the trial court

should have excluded Dr. Rice's trial testimony because his present value

calculations also lacked foundation as they were based on the value of future

medical expenses presented in Dr. Sapp's 2020 report, while Ms. Peralta testified

to future medical expenses presented in an undisclosed June 2021 report.  In

conclusion, defendants maintain that the trial court's decision to permit an

untimely identified expert to testify about a life care plan never seen by the

defendants, while concurrently limiting their ability to effectively cross-examine

the expert and allowing economic calculations based on outdated and inconsistent

reports, violated Louisiana's procedural and evidentiary safeguards designed to

ensure fairness and to prevent surprise.  They assert that these cumulative errors

resulted in substantial prejudice, denied them the opportunity to properly challenge

---

[8] According to the parties' discussions on the record, Dr. Rice's testimony was limited to Dr. Sapp's 2020 life care plan report because the last expert report that Dr. Rice prepared and produced to defendants was in August 2020.

[9] We recognize that Ms. Peralta testified to the range of future medical expenses before the parties alerted the trial court that the numbers were derived from a life care plan report never produced to defendants.

Mr. Williams' claim for future medical expenses, and ultimately produced an award unsupported by any competent evidence.

As a general rule, trial courts are afforded great discretion concerning the admission of evidence, and their decisions to admit or exclude evidence should not be reversed on appeal in the absence of an abuse of their discretion. *Medine v. Roniger*, 03-3436 (La. 7/2/04), 879 So.2d 706, 711; *Perniciaro*, 309 So.3d at 834. A trial court's ruling permitting an expert to testify at trial will not be disturbed on appeal absent a clear abuse of discretion. *Pierron v. Kimpton*, 24-313 (La. App. 5 Cir. 5/14/25), 415 So.3d 414, 429, *writ denied*, 25-756 (La. 10/1/25), 2025 WL 2792609. La. C.E. art. 702(A) requires that an expert's testimony be based on sufficient facts and data, and that the expert's opinion reflect a reliable application of the expert's principles and methods to the facts of the case.

Additionally, a party's failure to uphold his duty to timely supplement discovery responses may result in sanctions, such as excluding the testimony from a witness not properly disclosed to the adverse party. *Guidry v. Savoie*, 15-809 (La. App. 5 Cir. 5/26/16), 194 So.3d 1184, 1194, *writ denied*, 16-1218 (La. 10/17/16), 207 So.3d 1064. In deciding whether to impose such a sanction, the trial court is afforded vast discretion, and its rulings will not be overturned absent a clear abuse of that discretion. *Id*.

Importantly, error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected. La. C.E. art. 103(A).[10] Thus, erroneous evidentiary rulings are subject to a harmless error

---

[10] La. C.E. art. 103(A) provides:

> A. Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
>
> (1) Ruling admitting evidence. When the ruling is one admitting evidence, a timely objection or motion to admonish the jury to limit or disregard appears of record, stating the specific ground of objection; or
>
> (2) Ruling excluding evidence. When the ruling is one excluding evidence, the substance of the evidence was made known to the court by counsel.

analysis.  *Jackson v. Underwriters at Lloyd's of London*, 21-15 (La. App. 5 Cir. 9/29/21), 329 So.3d 1029, 1043, *writ denied*, 21-1591 (La. 1/12/22), 330 So.3d 617.  The proper inquiry for determining whether a party was prejudiced by a court's alleged erroneous ruling is whether the alleged error, when compared to the entire record, had a substantial effect on the outcome of the case.  *Chiasson v. Louisiana Med. Mut. Ins. Co.*, 19-618 (La. App. 1 Cir. 6/18/20), 307 So.3d 204, 208.  If the effect on the outcome of the case is not substantial, reversal is not warranted.  *Id.*  The party alleging prejudice by the evidentiary ruling of the court bears the burden of so proving.  *Id.*

This Court must also consider that a jury is given great discretion in its assessment of special damages.  *Guillory v. Lee*, 09-75 (La. 6/26/09), 16 So.3d 1104, 1116.  Thus, in order to disturb the jury's award of special damages, there must be no factual basis for the jury's determination and the finding must be clearly wrong.  *Kaiser v. Hardin*, 06-2092 (La. 4/11/07), 953 So.2d 802, 810.  To recover future medical expenses, a plaintiff must establish by a preponderance of the evidence that such expenses are medically necessary and will more probably than not be incurred.  An award for future medical expenses is inherently speculative and not susceptible of being calculated with mathematical certainty. *Menard v. Lafayette Ins. Co.*, 09-1869 (La. 3/16/10), 31 So.3d 996, 1006.  Future medical expenses will not be awarded in the absence of supporting medical testimony and estimations of their probable cost.  *Id.*  Nevertheless, when the record establishes that future medical expenses will be necessary and inevitable, courts should not reject the award because the record does not provide the exact value, if the court can determine from the record, past medical expenses, and other evidence a minimum amount that reasonable minds could not disagree would be required.  *Id.* (citing *Stiles v. K Mart Corp.*, 597 So.2d 1012 (La. 1992)).

Unfortunately, we do not have a complete transcript of all of the parties' arguments and the trial court's rulings on these issues because a number of the bench conferences were not transcribed. In addition, we do not have the various life care plan reports prepared by Dr. Sapp to fully understand the differences between the undisclosed report and the prior reports. Regardless, it is undeniable that the life care plan and economist testimony presented to the jury regarding the amounts of Mr. Williams' alleged future medical expenses lacked coherence and was extremely confusing. Ultimately, we must agree that the cumulative effect of allowing Ms. Peralta's testimony based on values contained in an undisclosed expert report, in combination with the inexplicable limitation on defendants' ability to cross-examine Ms. Peralta regarding the foundation for the numbers she provided, was error on the part of the trial court. The error was further compounded by the decision to permit the jury to hear Dr. Rice's video testimony, which provided present values derived from a 2020 life care plan that was different than the 2021 life care plan testified to by Ms. Peralta.

Despite these errors, as indicated above, evidentiary rulings are subject to the harmless error rule. In closing arguments, Mr. Williams asked the jury to award over $1.4 million in future medical expenses, based on the high end of the range of the future medical expenses testified to by Ms. Peralta and the present value of the additional future medical expenses that Mr. Williams sought for psychological treatment with Dr. Chrysanthe Parker totaling $883,676.00. The jury only awarded $150,000.00 for future medical expenses, which is substantially less than the amount requested.

Our review of the record indicates that even without the expert testimony from Ms. Peralta and corresponding testimony from Dr. Rice, there is evidentiary support for the $150,000.00 award. First, we note that the jury awarded Mr. Williams all of the past medical expenses he requested. His attorney stated during

closing arguments that based on the medical records introduced into evidence, the total past medical expenses for treatment of Mr. Williams' physical and mental health injuries totaled $99,760.50. The jury awarded $100,000.00. Therefore, the jury found the accident at issue caused Mr. Williams' past physical and mental health medical expenses. The jury also awarded Mr. Williams $45,000.00 for future physical pain and suffering and $50,000.00 for loss of enjoyment of life, thereby finding that the accident at issue would continue to affect Mr. Williams in the future. Defendants did not appeal either of these awards.

In addition, defendants did not raise any specific issues on appeal as to Dr. Parker's testimony regarding future mental health treatment that she recommended for Mr. Williams. Some of the treatment that Dr. Parker recommended for Mr. Williams included pastoral counseling once a month at the cost of $350.00 per hour for the rest of this life, totaling $120,666.00.[11] And she recommended PTSD counseling once a month at a cost of $600.00 per hour for the rest of Mr. Williams' life, totaling $206,856.00.[12] She also recommended an initial intensive outpatient therapy of five days at a cost of $13,669.00. Dr. Parker recommended other treatment and testing, but these three items alone total $341,191.00.

The jury also heard testimony from Dr. Kevin McCarthy, Mr. Williams' treating orthopedic spine surgeon, that Mr. Williams would require repeated radiofrequency ablation (rhizotomy) procedures for both the neck and back regions at intervals of every 12 to 18 months for up to ten years. The medical records contain charges for past rhizotomy procedures in the amount of $7,785.00, and the total for ten procedures would be $77,850.00. Dr. McCarthy also recommended epidural steroid injections in both the neck and back for radicular pain to be

---

[11] The yearly cost for pastoral counseling would be $4,200.00 ($350.00 x 12). The lifetime cost for this recommendation alone would be $120,666.00 ($4,200.00 x 28.73).

[12] The yearly cost for pastoral counseling would be $7,200.00 ($600.00 x 12). The lifetime cost for this recommendation alone would be $206,856.00 ($7,200.00 x 28.73).

repeated as long as they provide relief. Dr. McCarthy's records further indicate that he recommended three injections a year for five years in 2021, and the cost for one of these injections that Mr. Williams received in September 2020 was $1,728.00. The trial occurred two years later in 2023 and if the jury awarded three additional years of injections, the total would be $15,552.00.

Considering the above, if the jury awarded just these two treatments recommended by Dr. McCarthy and a fraction of the future mental health treatment recommended by Dr. Parker, these amounts alone support the jury's $150,000.00 award for future medical expenses. These calculations do not even include additional recommendations for physical therapy treatment, doctor's visits, or prescriptions.

Accordingly, we find that the trial court's error in allowing testimony from Ms. Peralta and Dr. Rice, and limiting defendant's cross-examination, was harmless. Thus, we find that this assignment of error is without merit. Clearly, these errors did not have a substantial impact on the outcome of the case.

### Mental Anguish Damages For Witnessing Mr. Alexander's Death

In their second assignment of error, defendants argue that the jury erred by awarding Mr. Williams mental anguish damages he suffered as a result of witnessing Mr. Alexander's death. Defendants argue that La. C.C. art. 2315.6 governs all damage awards for mental anguish and emotional distress suffered as a result of an injury to another person, and that Mr. Williams is not within the class of family members entitled to recover bystander or *Lejeune*[13] damages under La. C.C. art. 2315.6.[14] Defendants further contend that the trial court erred by denying

---

[13] *Lejeune v. Rayne Branch Hosp.*, 556 So.2d 559 (La. 1990).

[14] La. C.C. art. 2315.6 provides:

their request for a directed verdict on this issue and by denying their request for a jury instruction regarding the limits imposed by Article 2315.6 on the recovery of mental anguish damages resulting from an injury to another.

Mr. Williams argues in opposition that Article 2315.6 does not apply to limit the recovery of mental anguish or emotional distress damages suffered by a party who is a participant or victim of an incident causing the injury or death of the other person, as opposed to a mere bystander who only views the incident or comes upon the scene of the incident soon thereafter.

Mr. Williams' mental health care providers testified at trial that his involvement in the collision that caused Mr. Alexander's death resulted in severe and lasting psychological injuries. Mr. Williams testified that he looked at Mr. Alexander "in the eyes before he died." He further explained that he is not able to forget about his involvement in Mr. Alexander's death and continues to have flashbacks and nightmares about the collision. On cross-examination, Mr. Williams agreed that the PTSD and depression that he suffered following the collision all stem from witnessing the death of Mr. Alexander.

During the trial, defendants moved for a directed verdict seeking to dismiss the claims for mental anguish damages stemming from an injury to another. Defendants argued that all of Mr. Williams' claims for mental anguish arose from

---

A. The following persons who view an event causing injury to another person, or who come upon the scene of the event soon thereafter, may recover damages for mental anguish or emotional distress that they suffer as a result of the other person's injury:

(1) The spouse, child or children, and grandchild or grandchildren of the injured person, or either the spouse, the child or children, or the grandchild or grandchildren of the injured person.
(2) The father and mother of the injured person, or either of them.
(3) The brothers and sisters of the injured person or any of them.
(4) The grandfather and grandmother of the injured person, or either of them.

B. To recover for mental anguish or emotional distress under this Article, the injured person must suffer such harm that one can reasonably expect a person in the claimant's position to suffer serious mental anguish or emotional distress from the experience, and the claimant's mental anguish or emotional distress must be severe, debilitating, and foreseeable. Damages suffered as a result of mental anguish or emotional distress for injury to another shall be recovered only in accordance with this Article.

witnessing Mr. Alexander's death, and consequently, they were governed by La. C.C. art. 2315.6, which did not afford recovery to Mr. Williams. Defendants also stated that they were not challenging mental anguish or emotional distress damages resulting from Mr. Williams' own injuries. In response, Mr. Williams argued that La. C.C. art. 2315.6 did not apply to his claims because he was a victim of the collision at issue, and therefore, he could recover all emotional damages caused to him as a result of Mr. Alexander driving the tractor in front of the train under La. C.C. art. 2315. In denying defendants' request for a directed verdict on this issue, the trial court indicated that Mr. Williams had a cause of action to recover for serious emotional distress.

Defendants raised this issue again during the jury charge conference when they asked the trial court to include a charge instructing the jury on La. C.C. art. 2315.6. The trial court denied this request. Ultimately, the parties agreed to separate the mental anguish awards into two categories by including a line for "[m]ental anguish, stress and [a]nxiety due to physical injuries" and a separate line for "[m]ental anguish, stress, and anxiety due to witnessing Alexander [d]ie."

La. C.C. art. 2315.6(A) limits the individuals who can recover damages for mental anguish or emotional distress as a result of "view[ing] an event causing injury to another, or who come upon the scene of the event soon thereafter. . .." This is commonly referred to as the *Lejeune* or bystander recovery rule. However, Louisiana courts have long recognized a distinction between those who suffer an emotional reaction as bystanders that only view the incident and those who suffer psychological injuries because they are participants in the accident and involved in causing injury or death to another. *See Clomon v. Monroe City School Board*, 572 So.2d 571, 578 (La. 1990); *Guillory v. Arceneaux*, 580 So.2d 990 (La. App. 3rd Cir. 1991), *writ denied*, 587 So.2d 694 (La. 1991).

After the legislature codified the *Lejeune*/bystander recovery rule by enacting La. C.C. art. 2315.6 in 1991, courts continued to recognize that this rule did not apply to plaintiffs who suffered emotional distress due to their role as participants in an accident causing injury or death to another. *See Morris v. Maryland Cas. Co.*, 94-1556 (La. App. 3 Cir. 5/3/95), 657 So.2d 198, 199-200 (plaintiff train engineer who was driving locomotive that struck and killed the defendant driver was a participant and not a bystander under Article 2315.6); *see also Norred v. Radisson Hotel Corp.*, 95-748 (La. App. 1 Cir. 12/15/95), 665 So.2d 753, 755-56; *Wilson v. Professional Plaza Pharmacy, Inc.*, 04-1461 (La. App. 5 Cir. 5/31/05), 903 So.2d 651, 654, *writ denied*, 05-1997 (La. 2/17/06), 924 So.2d 1022 (finding that a mother "was not a participant in the incident, and her claim for mental anguish damages suffered as a result of the injury to her son could only be made pursuant to La. C.C. art. 2315.6"); Cullen J. Dupuy, Comment, *Negligent Infliction of Emotional Distress: The Effect of Article 2315.6*, 53 La. L. Rev. 555 (1992). Participants are not persons who only witness the injuring or killing of others; rather they seek mental anguish or emotional distress damages as a result of their direct involvement in causing the injury or death of others. *See Stanton v. Entergy Louisiana, LLC*, 21-367 (La. App. 4 Cir. 11/24/21), 332 So.3d 163, 169, *writ denied*, 21-1907 (La. 2/15/22), 332 So.3d 1185.

Just as in the present matter, the plaintiff in *Morris v. Maryland*, *supra*, was an engineer operating a train that hit a car and killed the driver. The engineer filed suit against the driver's heirs and liability insurer seeking damages for psychological harm he allegedly sustained as a result of the accident. The defendants filed an exception of no cause of action arguing that the plaintiff's claim was barred by the limitations set forth in La. C.C. art. 2315.6. The trial court granted the exception and dismissed the plaintiff's claims. The appellate court

reversed the ruling finding that La. C.C. art. 2315.6 did not apply because the plaintiff train engineer was a participant in the accident:

> Plaintiff was not a bystander who viewed the accident or came upon the scene shortly thereafter. Rather, he was a participant in the accident. Therefore, La.Civ.Code art. 2315.6 is inapplicable under the facts of the instant case and cannot be used to support the defendants' exception of no cause of action. In finding that the plaintiffs have stated a cause of action, we do not rely on the finding of a specific statutory duty owed to Mr. Morris by the decedent. Rather we find that under the general principles of Louisiana tort law, Mr. Morris has stated a cause of action for any damages he sustained as a result of being involved in the accident which resulted in the death of Mr. Lafleur.

*Morris*, 657 So.2d at 200.

In their appellate brief, defendants acknowledge that Louisiana courts have held "that 'participants' in accidents are not subject to the limitations of Article 2315.6, and can recover mental anguish damages arising out of accidents they were involved in." However, they argue on appeal that the line on the verdict form for mental anguish "due to witnessing Alexander die" was merely intended to award Mr. Williams bystander damages pursuant to Article 2315.6. This is contrary to the evidence and arguments presented at trial. Clearly, Mr. Williams was not a mere bystander as he was the locomotive engineer driving the train that killed Mr. Alexander, similar to the train engineer in the *Morris* case. Further, the evidence as a whole indicates that Mr. Williams did not simply suffer from PTSD and other emotional trauma due to witnessing Mr. Alexander's death, but also due to his involvement in causing the death as the engineer of the locomotive that collided with the tractor.

We also disagree with defendants that the use of the term "witnessing" on the verdict form means that Mr. Williams was somehow relegated to a bystander rather than a participant or victim in the accident. Our review of the trial transcript indicates that counsel for the parties agreed to include a separate line on the verdict form to preserve the issue for appeal, not to determine whether Mr. Williams could

recover separate damages in a strictly "bystander" role. Accordingly, this assignment of error is without merit.

*Punitive Damages*

In their third assignment of error, defendants raise three grounds in support of their argument that the trial court erred by awarding punitive damages against Roussel Farms based on its vicarious liability for its employee, Mr. Alexander. First, they contend the trial court failed to properly instruct the jury on vicarious liability for punitive damages and failed to include an adequate jury interrogatory on the verdict form to determine Roussel Farms' liability. Second, defendants argue that the evidence does not support the finding that Roussel Farms could have prevented or contributed to Mr. Alexander's alleged intoxication. And finally, they contend that the punitive damages award lacks evidentiary support because there was insufficient evidence to show that Mr. Alexander was impaired at the time of the accident.

The general public policy in Louisiana is against punitive damages. *Stephenson v. Bryce W. Hotard Sunbelt Rentals, Inc.*, 19-478 (La. 5/20/19), 271 So.3d 190, 192. Even when a statute authorizes the imposition of punitive damages, it is strictly construed. *Id*.

Here, Mr. Williams sought punitive damages under La. C.C. art. 2315.4, which provides:

> In addition to general and special damages, exemplary damages may be awarded upon proof that the injuries on which the action is based were caused by a wanton or reckless disregard for the rights and safety of others by a defendant whose intoxication while operating a motor vehicle was a cause in fact of the resulting injuries.

In order to establish a claim for exemplary damages under La. C.C. art. 2315.4, the plaintiff must prove the following elements: (1) that the defendant was intoxicated or had consumed a sufficient quantity of intoxicants to make him lose normal control of his mental and physical faculties; (2) that the intoxication was a

cause-in-fact of the resulting injuries; and (3) that the injuries were caused by the defendant's wanton or reckless disregard for the rights and safety of others. *Stephenson*, 271 So.3d at 192.

Plaintiffs can satisfy their burden of proof by using either direct or circumstantial evidence. *Hanks v. Entergy Corp.*, 06-477 (La. 12/18/06), 944 So.2d 564, 578. A fact established by direct evidence is one which has been testified to by witnesses as having come under the cognizance of their senses. *Id.* Circumstantial evidence, on the other hand, is evidence of one fact, or of a set of facts, from which the existence of the fact to be determined may reasonably be inferred. *Id.* If the plaintiff relies on circumstantial evidence to prove a defendant's intoxication, that evidence, taken as a whole, must exclude every other reasonable hypothesis with a fair amount of certainty. *Stephenson*, 271 So.3d at 192.

The jury's factual findings under the manifest error standard can only be reversed if the appellate court finds, based on the entire record, no reasonable factual basis for the factual finding and the fact finder is clearly wrong. *Rosell v. ESCO*, 549 So.2d 840, 844-45 (La. 1989).

As noted above, in order to establish a claim for exemplary damages under La. C.C. art. 2315.4, the plaintiff must first establish that the defendant was intoxicated or had consumed a sufficient quantity of intoxicants to make him lose normal control of his mental and physical faculties. In support of this element, Mr. Williams introduced evidence through the St. John the Baptist Parish coroner, Dr. Christy Montegut, the owner of Roussel Farms, Ricky Roussel, and a safety expert, Jimmy Sill.

Dr. Christy Montegut has served as coroner for St. John the Baptist Parish for over 35 years. He explained that it was standard procedure for the coroner's office to order toxicology tests for any traumatic fatality. Though he is not a

toxicologist, he explained that he has experience in the area of toxicology, primarily by means of conducting autopsies and reviewing toxicology tests used to determine the cause of death.[15]  Dr. Montegut explained that when drugs are consumed, they enter the bloodstream and are circulated throughout the entire body.  The kidneys eliminate the drugs and other waste substances contained in the blood through urine output.  Dr. Montegut explained that drugs may show up in urine for a period of time after they are consumed.

In the case of Mr. Alexander, Dr. Montegut explained that urine and blood samples were collected during the autopsy for testing.  A urine test was conducted as a screening tool to detect the possible presence of drugs.  Dr. Montegut explained that a urine test does not measure the quantity of the drug or substance in the body, but may indicate whether a drug may be in the body.  Because a urine test is very sensitive, it can indicate a false positive result.  He further explained that marijuana is detectable in urine for several days or weeks after use, and that cocaine is detectable for up to two days.

Dr. Montegut reviewed the toxicology report completed for Mr. Alexander and testified that the results of the urine test indicated a presumptive positive finding for cocaine/metabolites and cannabinoids.[16]  Following the presumptive positive results for both substances, the toxicology report explains that "[t]his test is an unconfirmed screen.  Confirmation by a more definitive technique such as GC/MS is recommended."  The reference comments for both results in the report further explained that a second test was necessary to confirm the presence of the substance:

> This result derives from a presumptive test, which may be subject to cross-reactivity with non-cannabinoid related compounds.  A second

---

[15] Toxicology is the study of the toxic or adverse effects of drugs and other agents on human beings.

[16] The toxicology report explains that cannabinoids are "chemical compounds derived from the plant Cannabis sativa (marijuana)."

test is necessary to confirm the presence of cannabinoid related compounds.

* * *

This result derives from a presumptive test, which may be subject to cross-reactivity with non-cocaine related compounds. A second test is necessary to confirm the presence of cocaine related compounds.

Dr. Montegut testified that the presumptive positive results from the urine test led the coroner's office to request blood tests. According to Dr. Montegut, blood tests are more precise and measure the levels of drugs or substances in the blood, if present. In this case, the blood tests were run for the presence of cocaine and marijuana because of the presumptive positive urine result. The results of the blood test were negative though. In addition, all tests were negative for alcohol. Dr. Montegut testified that he would have expected marijuana or cocaine to show up in Mr. Alexander's blood if he ingested these drugs on the day of the accident. He also stated that he would defer to a toxicologist on the issue of the influence that low levels of cocaine and marijuana might have on a person, and would agree if the toxicologist concluded that there was insufficient evidence to find that Mr. Alexander was intoxicated at the time of the accident.

Dr. Montegut also testified that he signed Mr. Alexander's death certificate, which listed the causes of death as multiple blunt force injuries with internal injuries; tractor vs. train accident; and polysubstance drug use – cocaine and marijuana. He explained, however, that it was the practice of the coroner's office in St. John the Baptist Parish to list all toxicological results of any amount on the death certificate, even if it was the presumptive positive urine test rather than the confirmatory blood test.

Rickey Roussel, the owner of Roussel Farms, testified that Mr. Alexander worked for his company as a tractor driver at various times since the 1980s. He stated that he had fired Mr. Alexander three or four times over the years. He also explained that Mr. Alexander would work for a period of time and quit. He stated

that Mr. Alexander did not have a driver's license because he "got a DWI." He also explained that in 2010, he fired Mr. Alexander for drinking alcohol during working hours. The separation notice contained in Mr. Alexander's employment file states that Mr. Alexander left work without notice on the company tractor. Mr. Roussel explained that Mr. Alexander was in the field plowing, and then decided to park the tractor and walk across the train tracks to go to a party. The notice states that after questioning Mr. Alexander, the owner "realized that [Mr. Alexander] was drinking alcohol during work hours, speech slurred/odor on his breath." After this incident, Mr. Alexander did not work for Roussel Farms for the next five years. Mr. Roussel explained that just prior to the accident at issue, he hired Mr. Alexander because he asked if he could work for a few days to earn money to buy items for Thanksgiving. The accident occurred two days after Mr. Roussel re-hired Mr. Alexander. Mr. Roussel also testified that he had never seen or heard of Mr. Alexander using marijuana, cocaine, or any other illegal drug.

The parties also presented excerpts of deposition testimony from Mr. Williams' safety expert, Jimmy Sill.[17] Defendants filed a motion in limine objecting to the introduction of any testimony from Mr. Sill related to the intoxication issue though. The trial court granted the motion in limine in part and ruled that it would not allow Mr. Sill to testify regarding the ultimate issue of whether Mr. Alexander was under the influence. In the deposition testimony introduced at trial, Mr. Sill explained that with respect to drug testing issues, he was "certified as a professional collector to train people on how to clinically collect drug and alcohol specimens" and also a "certified breathalyzer person." However, he agreed that he was not an expert in pharmacology or toxicology, and that he was

---

[17] Plaintiff's counsel referred to Mr. Sill as a safety expert. However, the trial court did not formally accept Mr. Sill as an expert in any field on the record at trial. Further, Mr. Sill did not testify in person at trial. Rather, Mr. Williams read excerpts of his deposition testimony into the record and defendants also designated and read additional excerpts.

not qualified to render an opinion regarding levels of intoxication and how certain levels affect an individual. Despite these limitations on his expertise and the trial court's ruling limiting Mr. Sill's testimony on intoxication, the trial court allowed Mr. Sill to testify that based on his review of the facts of the accident and video of the collision, Mr. Alexander exhibited "the characteristics of an individual who is intoxicated or under the influence."[18] Ultimately, however, Mr. Sill agreed that the levels of the substances and how they affect people required a toxicology report.

In response, defendants called Dr. William J. George, an expert in pharmacology and toxicology, to testify. Dr. George explained that the major organ in the body for metabolism is the liver, and when circulation ceases at death, metabolism stops, meaning substances present in the blood at the time of death would remain. The coroner's office collected blood and urine samples from Mr. Alexander during the autopsy conducted the morning after the accident. Dr. George reviewed the blood and urine test results, and explained that the initial urine test indicated the presence of metabolites of marijuana and cocaine. He stated that this initial test is a presumptive test, which suggests use of the identified substances, but the results required confirmation. Thus, a second ELISA test was conducted to detect the presence of marijuana, but the results were negative. A third highly sophisticated test, liquid chromatography mass spectrometry, was also performed. That result too was negative for metabolites or active compounds of marijuana or cocaine in Mr. Alexander's blood. Therefore, he explained that the presumptive tests failed when they conducted the confirmation tests.

On cross-examination, Dr. George was asked if he agreed that in his report, he stated that a "positive finding of cocaine metabolites in the urine obtained from

---

[18] The video was taken from the viewpoint of the train as it approached the intersection where the collision occurred. Due to trees obstructing the view of the road, the tractor did not become visible in the video until just seconds prior to the collision. In the video, the tractor moved slowly towards the train tracks and then in front of the train.

Mr. Alexander at cutoff levels would be indicative of a last-time use of cocaine during a detection window of time up to two to three days, 48 to 72 hours" and "a presence of cannabinoids in the urine would indicate a likely last time of use of marijuana of from two to three days up to as long as several weeks prior to the accident." He agreed but explained that there was insufficient evidence to suggest Mr. Alexander was intoxicated or impaired at the time of the accident, as there were no positive findings of active compounds of marijuana or cocaine in his blood. Dr. George also agreed with Dr. Montegut's testimony that there was no evidence Mr. Alexander consumed marijuana or cocaine on the day of the accident, as it would have shown up in the blood if ingested earlier that day.

In addition to arguing that the evidence is insufficient to prove intoxication, defendants also argue that the trial court erred by allowing Mr. Williams to introduce opinion testimony from Mr. Sill on this issue because he is a safety expert with no background in scientific toxicology. Defendants argued that Mr. Sill did not follow any valid methodology to determine whether Mr. Alexander was intoxicated. Defendants contend that Mr. Sill did nothing more than view the video from the accident and incorrectly opined that Mr. Alexander must have been intoxicated to drive the tractor in front of the oncoming train. According to the parties, the trial court ruled on the Friday prior to the trial that it would allow Mr. Sill's testimony subject to the limitation of excluding testimony regarding the ultimate issue of whether Mr. Alexander was under the influence.

On appeal, defendants again argue that Mr. Sill was not qualified to testify due to his lack of expertise in toxicology and because his opinion is unreliable as it is based solely on his observation that Mr. Alexander was driving erratically by driving onto the tracks in front of the oncoming train. Defendants further complain that the admission of Mr. Sill's testimony by means of his discovery deposition was procedurally improper because they were deprived of the opportunity to cross-

examine Mr. Sill as to his qualifications.  Mr. Williams does not address

defendants' arguments regarding whether the trial court erred by allowing opinion

testimony from Mr. Sill on the intoxication issue in his appellate brief.  Rather, he

relies on the presumptive positive urine test and the fact that the death certificate

listed "drug use/cocaine and marijuana" as a cause of death.  Further, in opening

and closing statements, Mr. Williams' counsel argued to the jury that Mr.

Alexander had to have been intoxicated to drive in front of the train.

We first address whether the trial court erred by admitting Mr. Sill's

testimony relating to the issue of intoxication at the time of the accident.[19]

A trial judge has great discretion concerning the admissibility and relevancy of

evidence, and he has wide latitude to determine whether an expert has the

competence, background, and experience to qualify.  *Williams v. State Farm Mut.*

*Auto. Ins. Co.*, 20-248 (La. App. 5 Cir. 2/17/21), 314 So.3d 1010, 1018, *writ*

*denied*, 21-402 (La. 5/11/21), 315 So.3d 871.   A witness who is qualified as an

expert by knowledge, skill, experience, training, or education may testify in the

form of an opinion or otherwise if the proponent demonstrates to the court that it is

more likely than not that: (1) the expert's scientific, technical, or other specialized

knowledge will help the trier of fact to understand the evidence or to determine a

fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony

is the product of reliable principles and methods; and (4) the expert's opinion

reflects a reliable application of the principle and methods to the facts of the case.

La. C.E. art. 702.  The trial court performs the important gatekeeping role of

ensuring that any and all scientific testimony or evidence admitted is not only

relevant, but reliable.  *Blair v. Coney*, 19-795 (La. 4/3/20), 340 So.3d 775, 781.  A

---

[19] We note that the manner in which this testimony was presented to the jury, with disjointed excerpts and extended speaking objections being allowed to play out in the presence of the jury, made it extremely confusing and difficult to follow.

trial court's ruling to qualify an expert to testify at trial will not be disturbed on appeal, absent a clear abuse of discretion. *Williams*, 314 So.3d at 1018.

We first find that it was error for the trial court to allow Mr. Sill to provide opinions without formally recognizing him as an expert in any field in the presence of the jury. Further, we find that the trial court abused its discretion by allowing Mr. Sill's testimony relating to issues of Mr. Alexander's intoxication due to Mr. Sill's lack of qualifications and the absence of reliability. Mr. Sill himself admitted that he was not qualified to testify about how certain levels of drugs would affect an individual. Furthermore, as noted above, the trial court had already ruled prior to the start of the trial that it would not allow the introduction of testimony regarding the ultimate issue of whether Mr. Alexander was under the influence. Despite its own ruling, the trial court then inexplicably allowed Mr. Williams to admit Mr. Sill's deposition testimony stating that at the time of the accident, Mr. Alexander had "the characteristics of an individual who is intoxicated or under the influence." It was also an abuse of discretion because it is undisputed that this testimony was based on the few seconds of video showing the tractor being driven in front of the train. This testimony did not reflect a reliable application of principle and methods to the facts of the case. In fact, the video does not depict any specific behavior by Mr. Alexander that would allow a determination as to whether or not he was intoxicated or had consumed a sufficient quantity of intoxicants to make him lose normal control of his mental and physical faculties. Thus, we agree with defendants that even if Mr. Sill's testimony on the issue of intoxication was properly admitted, it does not serve to satisfy Mr. Williams' burden to prove the intoxication element.

Mr. Williams also points to a presumption created by Mr. Alexander's death certificate, which lists a cause of death as "polysubstance drug use/cocaine and marijuana." But defendants clearly rebutted any presumption with Dr. Montegut's

testimony explaining that the coroner's office usually lists any positive toxicology results on the death certificate, despite the results of the confirmation blood tests. It is undisputed that the blood tests were negative. Dr. Montegut, Dr. George, and even Mr. Sill, all agreed that the confirmatory blood tests were negative for the presence of alcohol, cocaine, and marijuana. Furthermore, the only toxicologist to testify in the case was Dr. William George, who testified to a reasonable degree of medical scientific certainty that Mr. Alexander was not intoxicated or sufficiently impaired at the time of the accident.

Finally, Mr. Williams acknowledges on appeal that he relied only on circumstantial evidence to satisfy his burden of proof on the intoxication element. Notwithstanding, he fails to establish how he excluded every other reasonable hypothesis of why Mr. Alexander drove the tractor in front of the train with a reasonable amount of certainty. Mr. Williams' own witness, Jimmy Sill, acknowledged that these types of train incidents frequently occur without the involvement of intoxicating substances. Mr. Williams also testified that he was previously involved in a similar train collision that involved a suicide.

Just as in the instant matter, in *Stephenson*, *supra*, the plaintiff did not have any direct evidence that the defendant driver was intoxicated. The plaintiff relied on circumstantial evidence, citing his own testimony that the defendant was nervous, sweaty, and had droopy eyes. The plaintiff also testified that the defendant did not smell of alcohol and his speech was not impaired. The Louisiana Supreme Court recognized that because the plaintiff offered only circumstantial evidence of intoxication, he must exclude every other reasonable hypothesis with a fair amount of certainty. *Id.* at 192. In finding that the plaintiff failed to meet his burden to prove the defendant was intoxicated at the time of the accident, the court reasoned that testimony indicating that the defendant was nervous, sweaty, and had

droopy eyes did not exclude other reasonable explanations for such symptoms other than intoxication. *Id.*

After reviewing the entire record, we find that no reasonable factual basis exists for the jury's finding that Mr. Alexander was intoxicated or had consumed a sufficient quantity of intoxicants on the day of the accident to make him lose normal control of his mental and physical faculties. For all of these reasons, we find that the jury was clearly wrong by awarding punitive damages and reverse the award of $105,000.00 rendered in favor of Mr. Williams and against defendants. We pretermit discussion of the remaining grounds raised by defendants in support of their argument that the punitive damage award should be reversed.

## CONCLUSION

For all the reasons explained above, we affirm the awards for future medical expenses and mental anguish rendered in favor of plaintiff, Cy Williams, and against defendants, Roussel Farms, Inc., Louisiana Farm Bureau Mutual Insurance Company, and Southern Farm Bureau Casualty Insurance Company, and reverse the jury's award of $105,000.00 for punitive damages under La. C.C. art. 2315.4.

**AFFIRMED IN PART; REVERSED IN PART**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. TRAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **OCTOBER 17, 2025** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 24-CA-492

### E-NOTIFIED
40TH DISTRICT COURT (CLERK)
HONORABLE VERCELL FIFFIE (DISTRICT JUDGE)
VERCELL FIFFIE (APPELLANT)          JAMES K. ORDENEAUX (APPELLANT)          MATTHEW T. HABIG (APPELLANT)
SCOTT H. MASON (APPELLANT)

### MAILED
SOPHIA J. RILEY (APPELLEE)
ATTORNEY AT LAW
1215 INDEPENDENCE BOULEVARD
BUILDING 7-A
ZACHARY, LA 70791

WILLIE G. JOHNSON, JR. (APPELLEE)
ATTORNEY AT LAW
POST OFFICE BOX 84509
BATON ROUGE, LA 70884

JENNIFER C. VOSS (APPELLANT)
ASSISTANT DISTRICT ATTORNEY
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053